In the Matter of VAL DECKER
PACKING CO., Debtor.

Roger E. LURING, Chapter 7
Trustee, Plaintiff,

v.

MIAMI CITIZENS NATIONAL BANK
AND TRUST COMPANY, Defendant.

Bankruptcy No. 3–80–02391.
Adv. No. 3–83–0161.

United States Bankruptcy Court,
S.D.Ohio, W.D.

June 4, 1986.

Jack L. Neuenschwander, McCulloch, Felger, Fite & Gutmann Co., L.P.A., L. Craig Hallows, Piqua, Ohio, for plainitff.

John E. Fulker, Faust, Harrelson, Fulker & McCarthy, Troy, Ohio, for defendant.

Roger E. Luring, Troy, Ohio, Chapter 7 Trustee.

## DECISION GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THOMAS F. WALDRON, Bankruptcy Judge.

This is a case arising under 28 U.S.C. § 1334(a) and having been referred to this court is determined to be a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (F), in which the plaintiff, Chapter 7 Trustee, seeks to recover as a preference a portion of the funds paid to the defendant, Miami Citizens National Bank and Trust Company (hereinafter the Bank) by Val Decker Packing Co. (hereinafter Decker). As a result of a prepetition liquidation, the Bank's full claim was paid pursuant to a security interest granted to it in Decker's inventory and accounts receivable. This prepetition liquidation occurred within ninety (90) days of the filing of Decker's bankruptcy and a portion of the proceeds obtained satisfied a claim of the Bank in connection with a letter of credit issued by the Bank on Decker's behalf.

This matter is before the court on the plaintiff's complaint; the defendant's answer; the depositions of Wilford Behm and Jerry Zimmerman, Credit Manager and Senior Vice President of the Bank, respectively; the plaintiff's and defendant's motions for summary judgment and memoranda in support of their respective motions; plaintiff's reply memorandum; and the joint written stipulations of the parties.

## I. FACTS

The parties have stipulated that there are no material facts in dispute. The court finds the following relevant facts in this case.

On September 19, 1975, the Small Business Association (hereinafter the SBA) made a direct loan to the debtor, Decker, in the amount of $1.4 million. That loan was secured by a mortgage on Decker's real property, and by properly perfected security interests in various personal property and in "inventory and accounts receivable then owned or thereafter acquired together with the proceeds therefrom" (Stips. 43–44). In October of 1975, the SBA subordinated its security interest in inventory and accounts receivable granted for its loan of $600,000 in favor of the Bank to cover the Bank's loan to Decker (Dep. Zimmerman 8–9). The Bank's loan was covered by a security agreement dated October 16, 1975, in which Decker granted to the Bank a security interest in "All of Debtor's inventory now owned or hereafter acquired and all products and all proceeds arising therefrom;" and in:

> All of Debtor's existing accounts receivable and all of Debtor's accounts receivable which come into existence and all proceeds arising therefrom; ... to secure the payment of any and all liabilities of Debtor to Secured Party, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising (all hereinafter called "Liabilities").

(Stip. 1, Exh. A. p. 1). The security agreement defined liabilities to include "all indebtedness of Debtor to Bank of every kind and description, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising and howsoever evidenced." *Id.* The Bank had discretion to grant future loans, but "[e]ach loan or advance made by Bank to Debtor shall be evidenced by Debtor's note in form, substance and maturity acceptable to Bank." *Id.* The security agreement further provided that:

> 8. Upon the happening of any of the following events or conditions, namely: (I) default in the payment or performance of any of the Obligations or of any covenant or liability contained or referred to herein or in any note evidencing any of the Obligations, which is incorporated herein by reference in its entirety; ... (IV) death, dissolution, termination of existence, insolvency, business failure, appointment of a receiver of any part of the property of, assignment for the benefit of creditors by, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against, Debtor or any guarantor or surety for Debtor, or if Secured Party in good faith believes its prospect of payment or performance is impaired or insecure at any time; thereupon, or at any time thereafter (such default not having previously been cured) Secured Party at its option may declare all of the Obligations to be immediately due and payable and shall then have the remedies for a secured party under the laws of the State of Ohio, including, without limitation thereto, the right to take possession of the Collateral.

*Id.* at p. 3.

The security interest granted in this agreement was properly perfected by the timely filing of financing statements with the Recorder of Miami County, Ohio and the Secretary of State of Ohio. The financing statements described the collateral as: "All of Debtor's inventory now owned or hereafter acquired and all products and proceeds arising therefrom; All of Debtor's existing accounts receivable and all of Debtor's accounts receivable which come into existence and all proceeds arising therefrom" (Stips. 2–3, Exhs. B & C).

On April 22, 1977, the Bank established "Irrevocable Letter of Credit No. 228," effective June 1, 1977, in favor of Hamilton Mutual Insurance Company (hereinafter Hamilton) for the account of Decker, in an amount not to exceed $100,000, available by Hamilton's drafts at sight, provided each draft stated that it was:

Drawn by you and accompanied by your statement that you, as Surety, have executed one or more bonds on behalf of The Val Decker Packing Company, Piqua, Ohio, and that a claim has been made or a situation exists under which, in the sole judgment of the Surety, claim may be made or loss or expense sustained under said bond(s) and that monies represented by your drafts are required in the discretion of the Surety for its protection under said bond(s) or for payment of premiums.

(Stip. 35, Exh. Y). The letter of credit provided for automatic annual renewal unless the Bank notified Hamilton in writing thirty (30) days prior to the annual renewal date that the Bank elected not to renew. In that event, the letter of credit provided that Hamilton could draw under the letter of credit:

[W]ithout having incurred liability by reason of having executed your bond(s) ... and that the proceeds of your draft will be retained by you ... in the event your liability under your bond(s) is satisfied, you will refund to us the amount paid, less any amounts which may have been paid by you in the meantime under your bond(s) and any unpaid premiums due you on said bond(s).

*Id.*

No documentation was submitted evidencing the reason for or the terms of the Bank's issuing this letter of credit on Decker's behalf (*e.g.*, no application form or note). Although the letter of credit is reflected in the Bank's Commercial/Mortgage Trial Balance (Dep. Behm, Plaintiff's Exhs. 2–5) and the Bank's computer printout of Decker's account from December 1979—June 30, 1980 (Dep. Behm, Plaintiff's Exh. 7), it is not reflected in the Bank's accrual or permanent loan records (Dep. Behm, Plaintiff's Exh. 11).

Wilford Behm, Credit Manager for the Bank since January 7, 1978, in his deposition testified that typically he would expect to find in the customer's file a copy of the letter of credit, an undated note payable to the Bank in the amount of the letter, and an agreement between the Bank and the customer giving the terms of the letter of credit (Dep. Behm 3, 35–38). Mr. Behm testified he could not find a note in Decker's file and did not know whether one ever existed. *Id.* at 40. In response to a question asking whether there would be microfilm records of these documents, Behm stated that the Bank's microfilm records would not contain a note if it existed because only notes on which funds had been issued would have been microfilmed. He further testified that if a note had been issued, the customer would have a copy. *Id.* at 53–55. All he could produce pertaining to Decker's agreement with the Bank were statements covering the annual service charge of $200 for the letter. *Id.* at 39–41.

Mr. Jerry Zimmerman, Senior Vice President of the Bank for the last ten years, testified in his deposition that he had no personal knowledge of the circumstances surrounding the issuance of letter of credit (Dep. Zimmerman 4, 33–36).

On January 17, 1979, the SBA executed a subordination agreement waiving its priority security interest in Decker's inventory and accounts receivable in favor of the Bank and/or any participating bank in an amount not to exceed $1 million (Stip. 45).

Although the original financing statements had not yet expired, in October 1979, Cleveland Trust (now AmeriTrust of Cleveland, Ohio) (Stip. 18) (hereinafter AmeriTrust) had increased its participating line of credit to Decker to $1 million and requested the Bank prepare a second security agreement and new financing statements (Dep. Zimmerman 15). The new security agreement and financing statements were identical to those previously prepared (Stips. 6–8).

In March of 1980, the SBA prepared a third subordination agreement in favor of the Bank and/or any other participating bank in an aggregate not to exceed $1.5 million (Stip. 46). According to Mr. Zimmerman, this agreement was the result of the Bank and Decker going to the SBA in

order to permit the Bank to increase its financing to Decker (Dep. Zimmerman 17).

At the close of business June 18, 1980, Decker owed the Bank $1,477,884.34 (Stip. 39), consisting of: one note for $77,884.34; one note for $175,000; one note for $125,000; AmeriTrust's participation for $1 million; and the letter of credit for $100,000 (Dep. Behm, Plaintiff's Exh. 7).

On June 19, 1980, Decker signed a Revolving Note and Loan Agreement with the Bank for $1.5 million. That same day, AmeriTrust signed a participation certificate for $1 million in the $1.5 million loan (Stips. 40–41). Also on that same day, Decker entered into two separate and additional security agreements with the Bank, again granting security interests in Decker's inventory and accounts receivable, one agreement on the Bank's form, identical to the others previously signed, and the other on AmeriTrust's form (Stips. 9–10). These security agreements were accompanied by financing statements properly perfected by filing on June 20, 1980, describing the collateral exactly as it had previously been described (Stips. 10–11).

Mr. Behm testified that he did not know why the $100,000 letter of credit was combined with the other notes into the new note with a new note number issued on June 19, 1980, when previously the Bank's records did not show a note with a specific note number covering the letter of credit (Dep. Behm 58–59, 92–93).

On June 20, 1980, Continuation Statements were prepared, and filed on June 23, 1980, covering the original security agreement and financing statements filed in October 1975. The Continuation Statements were identical to those previously filed (Stips. 4–5). According to Mr. Behm, those statements were filed as part of the Bank's routine policy of renewing all financing statements six months before their expiration (Dep. Behm 79).

On June 23, 1980, a Single Maturity Time Certificate of Deposit was issued by the Bank which certified that the Bank or Hamilton had deposited $100,000, repayable on return of the Certificate 282 days after April 1, 1981, with interest of eight percent per annum (Dep. Zimmerman, Plaintiff's Exh. 1). Mr. Zimmerman testified that in a secured as opposed to an unsecured letter of credit the Bank would have a note to evidence the debt and then hold some collateral; he believed a Certificate of Deposit was used as collateral. He identified the above-mentioned Certificate of Deposit and testified that the money to pay for it came from Decker's line of credit established before June 19, 1980—the $100,000 line of credit held in case anyone drew on the letter (Dep. Zimmerman 26–30). Mr. Behm was not questioned about the Certificate of Deposit.

Between July 1 and July 25, 1980, the Bank took possession of Decker's inventory and accounts receivables and liquidated for itself and AmeriTrust $1,489,461.78, which included $11,577.44 in interest on the combined note of June 19, 1980. The balance realized was paid to the SBA (Stip. 49).

On August 8, 1980, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against Decker.

On August 25, 1980, Hamilton presented a sight draft conforming to the terms of the letter of credit through The First National Bank of Cincinnati. On August 28, 1980, the Certificate of Deposit held in the Bank's and Hamilton's names was redeemed by the Bank and $100,000 was wired to The First National Bank of Cincinnati in payment of the Bank's letter of credit in favor of Hamilton (Stips. 36–37). Mr. Behm testified that according to the Bank's records this was the only demand ever made on the letter of credit (Dep. Behm 44).

On October 1, 1980, the case was converted to a Chapter 11, and on March 31, 1982, an order for relief was entered adjudicating the case under Chapter 7. The interim trustee became the permanent trustee on April 30, 1982, the date of the first meeting of creditors.

## II. ISSUE PRESENTED

Did the defendant Bank receive a preference under 11 U.S.C. § 547 (Supp. IV 1980)

when on June 19, 1980, which was within ninety (90) days of the effective date of the order of relief being entered, it combined the $100,000 line of credit debt established under a letter of credit originally issued on April 22, 1977, with three outstanding notes already covered by perfected security interests in Decker's inventory and accounts receivable into a consolidated note covered by two new security agreements properly perfected on June 20, 1980, and then paid itself the $100,000 debt from the inventory and accounts receivable prepetition liquidation on July 25, 1980, although the Bank had at that point in time never been required to honor any demand for payment in connection with the letter of credit?[1]

### III. ARGUMENTS OF THE PARTIES

The plaintiff, Chapter 7 Trustee, asserts that because no note or collateral documents can be found evidencing the issuance of the original irrevocable letter of credit on April 22, 1977, as a secured obligation, the granting of the $100,000 line of credit for the letter of credit was an unsecured debt. The plaintiff further argues that it only became a secured debt when on June 19, 1980, it was combined into a note with other debts that previously had been covered by security agreements and properly filed financing statements and received new security in the form of a Certificate of Deposit for $100,000. Additionally, the plaintiff argues that the Bank's retention of the $100,000 from the liquidation of Decker's assets was a preferential transfer since the funds were obtained in violation of state law, specifically, Ohio Rev. Code Ann. § 1305.13(C) [U.C.C. § 5–114] (Page 1979).[2] The argument continues that this section authorizes reimbursement when a letter of credit has been honored; however, in this case, the letter of credit had not

been honored at the time the Bank obtained the $100,000 and no demand had even been made on the Bank. This improvement in position enabled the Bank to receive more than it would have received had the transfer not been made. 11 U.S.C. § 547(b)(5). Finally, the plaintiff argues that, Ohio Rev. Code Ann. §§ 1309.44–.47 [U.C.C. §§ 9–501–504] (Page 1979) conditions a creditor's proceeding against its collateral on there being a default under the security agreement and since there was no liability owing to the Bank because the letter of credit had never been honored, the collateral could not be taken and liquidated by the Bank.

The defendant Bank asserts that no preferential transfers occurred either on June 19 or July 25, 1980. The Bank claims its obligation on the letter of credit had been secured by all of Decker's inventory and accounts receivable under the terms of its security agreement dated October 16, 1975, and all subsequent security agreements, which covered all liabilities of Decker to the Bank whether "absolute or contingent, due or to become due, now existing or hereafter arising," and that consolidating Decker's outstanding indebtedness was merely a substitution of paper—a change in form but not in substance. The Bank's position is that a note was issued, but is no longer available: upon payment being made, it would have been returned to the debtor. The Bank maintains that its various security agreements prove that Decker's inventory and accounts receivable secured Decker's liability to reimburse the bank for issuing the letter of credit. The use of the Certificate of Deposit was merely a way of the Bank's guaranteeing to Hamilton its performance in the event of the Bank's insolvency: that was accomplished by segregating the funds and making the proceeds payable to the Bank or

---

1. The original complaint claimed $477,884.34 as a preference, i.e., the three notes of $77,884.34, $125,000, $175,000, and the $100,000 letter of credit. Plaintiff's motion for summary judgment, however, was limited to the $100,000 letter of credit.

2. "Unless otherwise agreed, an issurer which has duly honored a draft or demand for payment is entitled to immediate reimbursement of any payment made under the credit and to be put in effectively available funds not later than the day before maturity of any acceptance made under the credit." Ohio Rev. Code Ann. § 1305.13(C) (Page 1979).

Hamilton. The Bank asserts it was entitled to go against its security interest according to the terms of the security agreements. The Bank conceded, however, that the trustee has established the first four elements of a preference, § 547(b)(1)–(4), insofar as the transfer of $100,000 of liquidated assets to cover the letter of credit is concerned, but contends that the trustee has not met his burden of proof with respect to § 547(b)(5), because even as a secured creditor, the Bank simply obtained the amount it was properly entitled to receive from the security it liquidated.[3]

## IV. OPINION OF THE COURT

### A. Letters of Credit

Before embarking on the issue of whether the Bank acquired a preference when Decker granted the Bank a security interest in the $100,000 letter of credit upon the Bank's consolidating its notes or when it liquidated Decker's accounts receivable to cover the letter, some background is necessary to understand a letter of credit and its unique position in the commercial world.

■ A letter of credit is not a contract, a guaranty or a negotiable instrument—it is a letter of credit. J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* 713–15 (2d ed. 1980). A letter of credit is "an engagement by a bank or other person made at the request of a customer ... that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. A credit may be revocable or irrevocable." Ohio Rev. Code Ann. § 1305.01(A)(1) [U.C.C. § 5–103] (Page 1979). There are two types of letters of credit: commercial and standby. The commercial or more traditional letter of credit functions as a medium of payment for property or goods sold, most frequently in an international context. The standby letter of credit functions as a "back up" against customer default, the default of the customer triggering the issuer's obligation, somewhat like a guaranty. J. White & R. Summers, *supra* at 709. *See also* 23 Ohio Jur.3d, *Credit Cards and Letters of Credit* §§ 5–39 (1980 & Cum. Supp.1985); Saunders, *Preference Avoidance and Letter of Credit Supported Debt: The Bank's Reimbursement Risk in its Customer's Bankruptcy*, 102 Banking L.J. 240 (1985); Chaitman & Sovern, *Enjoining Payment on a Letter of Credit in Bankruptcy: A Tempest in a Twist Cap*, 20 Bus.Law. 21 (1982); McLaughlin, *Standby Letters of Credit and Penalty Clauses: An Unexpected Synergy*, 43 Ohio St. L.J. 1 (1982); McLaughlin, *Letters of Credit as Preferential Transfers in Bankruptcy*, 50 Fordham L.Rev. 1033 (1981–82). The letter of credit in the instant case, therefore, can be classified as an irrevocable standby letter of credit.

■ The basic parties to all types of letters of credit are three: the customer, the issuer and the beneficiary. The customer is the person who causes the issuer (usually a bank) to issue the letter of credit to a beneficiary, the person who is entitled to draw or demand payment under the terms of the letter of credit. Ohio Rev. Code Ann. § 1305.01(A)(1), (3), (4) & (7). The issuance of a letter of credit represents three independent agreements:

> [T]he issuing bank and its customer agree on the terms in the letter to be issued and the means by which the customer will reimburse the bank; the bank issues the letter to a beneficiary which receives rights against the bank under terms of the letter (no consideration needs to flow from the beneficiary to the issuing bank, RC § 1305.04 [UCC 5–105]; and the underlying sales contract (or other transaction) between the customer and the beneficiary.

Ohio Rev. Code Ann. Editor's Analysis to § 1305.09 [U.C.C. § 5–110] (Page 1979). Once a letter of credit is issued, the issuer

---

**3.** Defendant's answer, although no later pleadings or motions developed it, also claimed this action was barred by the statute of limitations— 11 U.S.C. § 546. The court finds the action is not barred, because the Chapter 7 Trustee was appointed on August 30, 1982, and this action was filed on March 4, 1983, which is within two years of the trustee's appointment.

is statutorily obligated to honor drafts meeting its terms, regardless of any dispute between the customer and the beneficiary about the underlying transaction (proof of forgery or fraud being the only exceptions and in such situations court approval to enjoin such honor is required). Ohio Rev. Code Ann. § 1305.13; J. White & R. Summers, *supra* at 711; Saunders, *supra* at 242.

■ Unless otherwise agreed, a customer is statutorily obligated to reimburse the issuer who has honored a draft for payment. Ohio Rev. Code Ann. § 1305.13. The beneficiary has no statutory duties but must present a draft conforming to the terms of the letter of credit in order to receive payment.

Unless otherwise agreed, a letter of credit is established:

(1) as regards the customer as soon as a letter of credit is sent to him or the letter of credit or an authorized written advice of its issuance is sent to the beneficiary; and

(2) as regards the beneficiary when he receives a letter of credit or an authorized written advice of its issuance.

Ohio Rev. Code Ann. § 1305.05(A) [U.C.C. § 5–106] (Page 1979). Once an irrevocable letter of credit is established, an issuer is no longer free to take unilateral action to cancel or modify it. Ohio Rev. Code Ann. § 1305.05(B).

Because of its unique function of guaranteeing obligations, thereby allaying fears of insolvency, breach of warranty or other contractual disputes between the parties to the underlying transaction, McLaughlin, 43 Ohio St.L.J., *supra* at 5, attacking a letter of credit transaction causes great distress in the commercial world. Saunders, *supra;* Chaitman and Sovern, *supra;* McLaughlin, 50 Fordham L.Rev., *supra*. None of the commentators, however, have posed hypothetical situations such as the one before this court, *i.e.*, where a bank prior to honoring a draft on a letter of credit is reimbursed through liquidation of its alleged security interest.

Neither are the cases dealing with preferential transfers in a letter of credit situation exactly on point. The difficulty stems basically from the unique tripartite nature of the letter of credit—that different parties have different obligations. The cases generally focus on the issuer-beneficiary relationship, seeking to find as preferential a bank's honoring of a letter of credit to a beneficiary. *Postal v. Smith (In re Marine Distributors, Inc.)*, 522 F.2d 791 (9th Cir.1975) (bankruptcy court had no jurisdiction to enjoin payment to beneficiary of debtor's unsecured outstanding letter of credit as letter of credit was not property of the estate); *Westinghouse Credit Corporation v. Page (In re Page)*, 18 B.R. 713 (D.D.C.1982) (district court lifted preliminary injunction staying bank's honoring of secured letter of credit as it was not property of the estate); *Braucher v. Continental Illinois National Bank and Trust Company of Chicago (In re Illinois—California Express, Inc.)*, 50 B.R. 232 (Bankr. D.Colo.1985) (bankruptcy court had no jurisdiction to hear breach of contract action brought by trustee against bank for honoring debtor's secured letters of credit following its bankruptcy); *Erman v. Armco, Inc. (In re Formed Tubes, Inc.)*, 12 B.C.D. 331, 41 B.R. 819 (Bankr.E.D.Mich.1984) (motion for summary judgment denied to beneficiary of letter of credit as he did not have a security interest in property of the debtor; honoring a letter of credit was a preference because beneficiary was unsecured creditor); *In re W.L. Mead, Inc.*, 42 B.R. 57 (Bankr.N.D.Ohio 1984) (relief from stay granted to bank to allow it to honor secured letter of credit, as creditor was adequately protected by security and debtor-in-possession offered no proof that collateral was necessary for effective reorganization); *M.J. Sales & Distributing Company, Inc.*, 9 B.C.D. 1342, 25 B.R. 608 (Bankr.S.D.N.Y.1982) (stay lifted to permit bank to honor secured letter of credit as bank honors letter of credit with its own funds not those of the customer); *Twist Cap, Inc. v. Southwest Bank of Tampa (In re Twist Cap, Inc.)*, 1 B.R. 284 (Bankr.D. Fla.1979) (preliminary injunction granted

prohibiting bank from honoring secured letters of credit until disposition of controversy on merits).

■ It has now generally been held that a bank can honor a letter of credit to a beneficiary because the money going to the beneficiary belongs to the issuer, not the debtor, and, therefore, is not property of the estate under 11 U.S.C. § 541 (Supp. IV 1980). *In re Marine Distributors, Inc.*, 522 F.2d at 795; *In re Page*, 18 B.R. at 716; *In re Illinois—California Express, Inc.*, 50 B.R. at 235; *In re M.J. Sales & Distributing Company, Inc.*, 9 B.C.D. at 1346, 25 B.R. 608; *see also* Official Comment to Ohio Rev. Code Ann. § 1305.16 [U.C.C. § 5–117] (Page 1979): "A bank which issues a letter of credit acts as a principal, not as an agent for its customer, and engages in its own credit"; *cf. In re Formed Tubes, Inc.*, 12 B.C.D. at 331, 41 B.R. 821 (finding a preference in spite of the general rule because the beneficiary of the letter of credit was treated as an unsecured creditor of the debtor with no secured claim to property of the estate). In contrast, the collateral which secures a letter of credit is considered property of the debtor's estate. *In re W.L. Mead, Inc.*, 42 B.R. at 59.

In a preference action, however, it is not the relationship of the issuer to the beneficiary that is critical; nor is it the relationship of the beneficiary to the customer as that is the original creditor-debtor relationship which the letter of credit serves to sever. Rather, it is the direct relationship of the issuer to the customer. This is particularly evident here because the trustee is not seeking to enjoin the honoring of the letter of credit (it, in fact, was honored post-petition). If the focus stays on the issuer-customer, the significance of the origin of this basically creditor-debtor relationship in a letter of credit transaction becomes diminished and the analysis can proceed like any other preference determination, *i.e.*, whether a transfer of the debtor's property or a security interest therein

from the debtor (customer) to the creditor (issuer) was preferential. The first step in such a determination is to categorize the creditor's (Bank's) rights in the debtor's property as secured or unsecured.

### B. Preference

**1. Was the letter of credit issued on April 22, 1977 a secured or unsecured debt?**

■ As a general rule, a trustee does not attack as preferential payments made to a fully secured creditor during the ninety (90) day period before bankruptcy on the ground that "to the extent a secured creditor holding valuable collateral receives payment prior to bankruptcy, the amount of the secured claim is proportionately reduced." *Gilbert v. Gem City Savings Association (In re Hale)*, 15 B.R. 565, 567 (Bankr.S.D.Ohio 1981) (quoting *In re Hawkins Manufacturing, Inc.*, 11 B.R. 512, 513 (Bankr.D.Colo.1981)). However, a trustee will attack as preferential a debt that prior to the preference period was secured by inventory or accounts receivable when the creditor by virtue of his floating lien is able to improve his position to the prejudice of unsecured creditors during the ninety (90) day period before bankruptcy. § 547(c)(5); *see e.g., A.I. Credit Corporation v. Drabkin (In re Auto-Train Corporation)*, 49 B.R. 605 (D.D.C.1985); 4 *Collier on Bankruptcy* ¶ 547.51 (15th ed. 1986). Also, a trustee will attack what otherwise appears to be a perfected security interest if that interest was granted within ninety (90) days of bankruptcy, unless its purpose was to enable the debtor to acquire the property subject to the security interest. § 547(c)(3); *see e.g., Ledford v. General Motors Acceptance Corp., (In re Lorandos)*, 58 B.R. 519 (Bankr.S.D.Ohio 1986); 4 *Collier on Bankruptcy* ¶ 547.39 (15th ed. 1986). Since the creditor did not have a floating lien and the debtor did not receive an enabling loan, if the letter of credit issued on April 22, 1977, was secured at that point in time, it would be protected against attack as a preference.[4] This is

---

**4.** Neither side raised any of the exceptions to preferential transfer provided in 11 U.S.C. § 547(c).

because any subsequent security agreement can be defended as merely a substitution of the previous one and the secured party did not improve its position. *Citizens Fidelity Bank & Trust Co. v. All-Brite Sign Service Co., Inc., (In re All-Brite Sign Service Co., Inc.)*, 7 B.C.D. 844, 11 B.R. 409 (Bankr.W.D.Ky.1981) (no preference where course of dealing established).

If the issuance of the letter of credit was unsecured, however, the trustee can recover the payment made to the Bank.

■ The court finds the issuance of the letter of credit on April 22, 1977, must be characterized as an unsecured debt. The Bank's October 16, 1975, security agreement with Decker covered "all indebtedness," whether "absolute or contingent, due or to become due." Although the majority of courts in keeping with the Uniform Commercial Code's repudiation of "pre-Code learning condemning dragnet provisions," uphold broad descriptions of collateral in security agreements, T. White & R. Summers, *supra* at 910–11, there are limits to how broad a description can be and still serve its evidentiary function of making "possible the identification of the thing described." Official Comment to § 1309.08 [U.C.C. § 9–110] (Page 1979). For example, a security agreement is limited to the collateral specified therein. *In re Mahleres*, 53 B.R. 86 (Bankr.D.Colo.1985) (a security interest in sheep was held not to include a security interest in wool or the products of sheep). Overbreadth, therefore, remains a factor in determining whether or not a security interest in collateral was granted. *See Coseo v. Alpena Savings Bank*, 612 F.2d 276 (6th Cir.1980) (holding a transfer of vehicles not preferential because the description of the collateral in the security agreement was not overly broad).

In contrast to the voluminous case law dealing with descriptions of collateral in security agreements and financing statements, little has been written about other blanket provisions in security agreements, such as those covering "liabilities." Still, the same principles of interpretation should and, where they have arisen, do apply. Where a security agreement granted a security interest in all receivables and proceeds as security for all liabilities, "Receivables" defined as "all of Debtor's Accounts Receivable," and "Liabilities" as "any and all indebtedness of Debtor to Secured Party of every kind and description, now existing or hereafter arising," the Third Circuit Court of Appeals found the language insufficient to establish a security interest in after-acquired accounts receivable. *In re Middle Atlantic Stud Welding Co.*, 503 F.2d 1133, 1134 (3d Cir.1974).

■ Overexpansive use of language is limited not only by the difficult to define court-imposed requirement of conscionability in contracts, but also by the easier to determine self-imposed requirements written by the parties in their contracts. The critical question is: Did the parties agree to specific requirements and if so were these requirements complied with? Here, we find that the Bank which exercised superior control in the negotiation and drafting process set forth a specific requirement to evidence a secured debt and then failed to comply with that requirement. The security agreement required that each "loan or advance ... to be secured as herein provided; ... shall be evidenced by Debtor's note in form, substance and maturity acceptable to Bank" (Stip. Exh. A, Items 1(C) and 2. No note or other evidence of the terms of the usual agreement between an issuer and its customer could be produced (*e.g.*, the application for the letter of credit). This is in clear contrast to the June 19, 1980, transaction when the letter of credit was combined into a note. The note itself was evidenced by the Bank's internal records. It further provided for a specific interest rate to be applied. Also, the Bank deliberately segregated its own funds and procured a Certificate of Deposit in its and the beneficiary's (Hamilton's) name. The Bank's argument that any note that might have been issued would have been returned to Decker after payment is not persuasive, since all the other transactions covered by the liquidated accounts

receivable and inventory were evidenced by copies of the original notes and other records indicating the security covered by them. The Bank set its own evidentiary requirement and failed to live up to it. It cannot shift the burden to Decker.

While the absence of a note and other documents supporting a security interest does not prevent the recognition of the $100,000 as a debt due to the Bank, it requires that the debt be characterized as unsecured rather than secured.

### 2. What was the effect of the combined note of June 19, 1980?

 By combining the three outstanding promissory notes for loans of $77,884.34, $175,000 and $125,000 with the letter of credit for $100,000 into a new note for $477,884.34, the debt of $100,000 not only became subject to payment of interest (two percent over prime), but more importantly for the Bank's position, the note became secured since Decker simultaneously granted the Bank a security interest in all of its inventory and accounts receivable which the Bank perfected on the next day—June 20, 1980.

Combining the letter of credit with its other debts had several beneficial effects for the Bank. First, the Bank could now evidence its perfected security interest in the letter of credit. Secondly, collection on its security interest became simplified. The Bank no longer considered it necessary to have to wait until a draft was submitted by the beneficiary, Hamilton, before it could seek reimbursement, as provided in Ohio Rev. Code Ann. § 1305.13(C) (which event never occurred prepetition); instead, the Bank merely had to wait until Decker defaulted, or the Bank had reason to believe it would default, on its payment under the note to pursue the remedies provided by Ohio Rev. Code Ann. §§ 1309.44–.47.

The issue remaining is whether this security interest can be attacked as a preference because it was granted within ninety (90) days of bankruptcy.

### 3. When did the "transfer" occur?

Preliminary to establishing the five elements of a preference under § 547(b) is the determination of the date the transfer of the debtor's property occurred.

A " 'transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest." 11 U.S.C. § 101(40) (Supp. IV 1980); cf. current 11 U.S.C. § 101(48).

Since Decker did not grant a security interest to the Bank when the Bank issued its letter of credit on April 22, 1977, no transfer of Decker's property occurred at that time. However, Decker still became a creditor of the Bank at that time because issuance of the letter of credit to Hamilton created an obligation on Decker's part to reimburse the Bank, contingent upon its honoring a draft conforming to the terms of the letter of credit. Thus, a debtor-creditor relationship was established between Decker and the Bank. Ohio Rev.Code Ann. §§ 1305.01(A)(1), 1305.05 & 1305.13. *In re Hart Ski Mfg. Co., Inc.,* 6 B.C.D. at 1432, 11 B.R. 409. A "claim" exists under 11 U.S.C. § 101(4)(A) (Supp. IV 1980) whether or not it is contingent. On the contingency occurring and the letter of credit being honored, the claim becomes fixed. *Briggs Transportation Co. v. Norwest Bank Minneapolis, N.A. (In re Briggs Transportation Co.),* 37 B.R. 76, 79 (Bankr.D.Minn. 1984).

However, no property of the debtor was disposed of until June 19, 1980, when Decker granted the Bank a security interest in its inventory and accounts receivable. Since the transfer of that security interest was perfected within ten (10) days, the transfer for preference purposes is considered to have occurred when the agreement took effect—June 19, 1980. 11 U.S.C. § 547(e)(2)(A) (Supp. IV 1980). "[D]iminution in the debtor's estate occurred ... at the time the collateral was pledged; not when the bank looked to its collateral for reimbursement." *In re M.J. Sales & Dis-*

*tributing Company, Inc.,* 9 B.C.D. at 1345, 25 B.R. 608. The bankruptcy court in *M.J. Sales & Distributing Company, Inc.* was contrasting a security interest granted more than eighteen months prior to bankruptcy with a bank's seeking reimbursement from its collateral after honoring the letter post-petition. The case before this court, however, involves two events which both occurred within the ninety-day (90) prepetition period: (1) a security interest was granted the Bank; and (2) the Bank sought reimbursement from its collateral prior to receiving a demand to honor the letter of credit. The critical date for the transfer which put Decker at risk of loss of its property and improved the Bank's position was the initial transfer to the Bank of a security interest in its inventory and accounts receivable—June 19, 1980.

### 4. Elements of a Preference Under § 547(b).

In order for transfer to be found preferential, the plaintiff must establish by a preponderance of the evidence the following five elements:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

§ 547(b) (Supp. IV 1980). *Foreman Industries, Inc. v. Broadway Sand & Gravel (In re Foreman Industries, Inc.),* 59 B.R. 145, 148 (Bankr.S.D.Ohio 1986).

The defendant has conceded and the court concurs that the trustee has met his burden of proof with respect to the first four elements that:

(1) the transfer of the security interest on June 19, 1980, was "to or for the benefit of a creditor" (the Bank);

(2) the transfer was "for or on account of an antecedent debt (the letter of credit) owed by the debtor before such transfer was made (since April 22, 1977);

(3) the transfer was "made while the debtor was insolvent" (relying on the presumption of insolvency established by 11 U.S.C. § 547(f), the Bank offering no evidence to rebut the presumption); and

(4) the transfer (on June 19, 1980) was made "on or within 90 days before the date of the filing of the petition" (August 8, 1980).

The only element that is in dispute is the fifth *i.e.,* whether the transfer enabled the Bank to receive more than it would have received had the transfer not been made and had the Bank "received payment of such debt to the extent provided by provisions of this title." § 547(b)(5)(B), (C). The "greater percentage" test for avoiding a transfer as preferential was met by the fact that had the transfer of a security interest in inventory and accounts receivable not been made the Bank would have been an unsecured creditor with less than a 100 percent distribution, *Tidwell v. Fickling & Walker Insurance Agency, Inc. (In re Georgia Steel, Inc.),* 58 B.R. 153, 157 (Bankr.M.D.Ga. 1984), who would not have been able to receive payment on its unsecured claim un-

til it actually honored the letter of credit.[5] As a result of the preference the Bank was able to recover 100 percent of its unsecured claim without ever honoring a letter of credit and without Decker's total liability under that letter of credit ever having been established.

The Bank argued that even if the transfer of Decker's security interest on June 19, 1980, constituted a preference, such preference would redound only to the benefit of the SBA and not to the unsecured creditors. No evidence was submitted on this issue. In fact, the SBA did not even file a proof of claim in this case, thus its status as a secured or unsecured claimant does not appear in the file. The future resolution of the proper claimants to this $100,000 fund cannot be a present justification for a creditor whose retention of the fund is not in accordance with bankruptcy law. All elements of a preference having been established and no evidence having been submitted to establish an exception to the preference under § 547(c), this court finds the transfer preferential and avoidable by the trustee.

## V. HOLDING

The granting of the security interest on June 19, 1980, in the $100,000 letter of credit and the subsequent liquidation of that security interest prepetition having been found to be preferential, the court HEREBY GRANTS the plaintiff's motion for summary judgment and DENIES the defendant's motion for summary judgment and ORDERS the preference AVOIDED. IT IS FURTHER ORDERED that the defendant Bank refund to the Chapter 7 Trustee the $100,000 and all interest received by the Bank in the liquidation of July 25, 1980, attributable to the $100,000 letter of credit, plus interest in accordance with 28 U.S.C. § 1961(a), from March 4, 1983, the date the complaint was filed, together with the cost of the filing fee for this adversary proceeding. *See In re Fore-*man Industries, Inc. at 154–57 on the issue of prejudgment interest.

---

5. The debtor's schedules filed on October 31, 1980, showed $46,500 in assets and $2,818,-536.76 in liabilities on which approximately $1.7 million in proofs of claim have been filed.