RICHARD G. FANSLOW, Plaintiff-Appellant, v. THE NORTHERN TRUST COMPANY, Defendant-Appellee.

First District (1st Division)   No. 1—96—3136

Opinion filed August 31, 1998.

22

Rosenthal & Schanfield, P.C., of Chicago (Mark S. Lieberman and Stephen P. Kikoler, of counsel), for appellant.

Baker & McKenzie, of Chicago (Michael A. Pollard and John M. Murphy, of counsel), for appellee.

JUSTICE O'BRIEN delivered the opinion of the court:

Plaintiff, Richard G. Fanslow, filed a complaint against defendant, The Northern Trust Company (Northern Trust), alleging wrongful dishonor of a letter of credit (count I), nonpayment of a sight draft after acceptance (count II), and breach of good faith (count III). The trial court entered summary judgment in favor of Northern Trust on counts I and II and dismissed count III. Plaintiff appealed. We affirm.

In 1988, a corporation owned and controlled by Fanslow sold its interest in Summit National Life Insurance Company (Summit) to SNL Corporation, which was controlled by Allen Stewart (Stewart).[1] To partially finance the transaction, Stewart gave Fanslow a "Promissory Note Secured by Letter of Credit." The letter of credit was issued by Northern Trust for Fanslow's benefit (the NTC L/C). The NTC L/C provided, in pertinent part:

"WE HEREBY ISSUE THIS IRREVOCABLE STANDBY LETTER OF CREDIT WHICH IS AVAILABLE BY YOUR DRAFT DRAWN AT SIGHT ON US, BEARING THE CLAUSE 'DRAWN UNDER IRREVOCABLE STAND-BY LETTER OF CREDIT NO. S253144 OF THE NORTHERN TRUST COMPANY' WHEN ACCOMPANIED BY:

1. A STATEMENT PURPORTEDLY SIGNED BY RICHARD G. FANSLOW OR HIS AUTHORIZED REPRESENTATIVE STATING THAT:

(1) SNL CORPORATION HAS DEFAULTED IN ONE OR MORE OF ITS OBLIGATIONS UNDER THE TERMS OF THE PROMISSORY NOTE IN THE AMOUNT OF USD 6,400,000.00 PAYABLE TO THE ORDER OF RICHARD G. FANSLOW AND DATED OCTOBER 5, 1988 (THE 'NOTE'), THEREFORE IMMEDIATE PAYMENT OF USD (INSERT AMOUNT OF DRAFT) IS NOW DUE AND OWING UNDER THE NOTE.

\* \* \*

WE HEREBY ENGAGE WITH YOU THAT ALL DOCUMENTS PRESENTED IN COMPLIANCE WITH THE TERMS OF THIS LETTER OF CREDIT WILL BE DULY HONORED BY US WITHIN THREE WORKING DAYS IF DELIVERED TO THE NORTHERN TRUST COMPANY, 802 S. CANAL STREET, CHICAGO, ILLINOIS, 60675 PRIOR TO 3 PM ON OR BEFORE THE EXPIRATION DATE."

---

[1] During the pendency of this appeal, Stewart became the subject of a 63-count federal indictment issued on December 4, 1996, alleging insurance fraud in relation to his business dealings with Summit and another insurance company.

A separate $8 million letter of credit was issued by Merrill Lynch International Bank (London) (MLIB) to secure the NTC L/C (the MLIB L/C). In turn, Stewart pledged some $8 million on deposit with MLIB in London to secure the MLIB L/C.

Shortly after the sale and purchase of Summit, the insurance company experienced severe financial difficulties and filed a petition for rehabilitation with the Commonwealth Court of Pennsylvania (the Pennsylvania lawsuit). In its effort to preserve the assets of the rehabilitation estate, the Pennsylvania Insurance Commissioner applied to the Commonwealth Court for an injunction against Fanslow, Northern Trust and MLIB to prevent them from exercising their rights and obligations under the NTC L/C and the MLIB L/C. The Pennsylvania Insurance Commissioner alleged that the $8 million on deposit with MLIB in London which secured the MLIB L/C (and by extension the NTC L/C) also secured another and later-created obligation owed to Summit by Stewart and thus the funds belonged to the Summit rehabilitation estate rather than to Fanslow. The nature of the Pennsylvania Insurance Commissioner's request notwithstanding, the application failed to name either Fanslow or Northern Trust as a party. Consequently neither was formally served with process, although Fanslow (but not Northern Trust) was informed of a hearing scheduled for September 29, 1994.

At the September 29, 1994, hearing, both MLIB and Fanslow appeared specially to contest jurisdiction. Northern Trust did not appear. The Pennsylvania court nevertheless enjoined MLIB from paying on the MLIB L/C. It did not, however, enjoin Fanslow from drawing upon or Northern Trust from paying upon the NTC L/C. The court's supplemental memorandum issued in relation to this decision states:

"In seeking this relief, the [Pennsylvania Insurance Commissioner] asked us to take action over Fanslow which would ineluctably affect the legal and substantive rights of Northern Trust. However, Northern Trust was not named as a party, not mentioned in the pleading and was not served or otherwise notified.

Although all counsel agreed at hearing on the rehabilitator's emergency request that Northern Trust had an obligation to Fanslow by virtue of the letter of credit, no evidence was produced to establish this obligation. ***

Thus, the court is in no position to take action to interdict a banking relationship in another jurisdiction involving a letter of credit, without the least notification to the issuing bank, which it appears, is putatively a real party in interest in these proceedings."

On October 1, 1994, Stewart failed to make a scheduled interest payment on the note secured by the NTC L/C. Consequently, on the

morning of October 3, 1994, Fanslow presented certain documents to Northern Trust to draw upon the NTC L/C. Later that same day, the Pennsylvania Insurance Commissioner amended its application to the Pennsylvania court for an injunction to name Northern Trust as a "party in interest." Also, Northern Trust notified Fanslow that the tendered draw documents were not acceptable.

In response, Fanslow delivered additional documents to Northern Trust the next morning. Among the additional documents was a sight draft for $8 million. The sight draft was date-stamped and signed or initialed by an authorized representative of the international banking department of Northern Trust. Later that same day, without further hearing and despite lack of process or an attempt at service or any other notice, the Pennsylvania court issued an *ex parte* order enjoining Fanslow from drawing on the NTC L/C, enjoining Northern Trust from paying under the NTC L/C, and enjoining MLIB from paying under the MLIB L/C. The same order required the "parties" to file a memorandum of law "on the question of this court's jurisdiction to enter injunctive relief." Citing the Pennsylvania court order, Northern Trust refused to pay on the previously tendered draw documents although it acknowledged that they were complete and complied in all respects with the NTC L/C's requirements.

The hearing on the Pennsylvania court's jurisdiction to enter injunctive relief continued on October 12, 1994. As of that date, Northern Trust had not been served with any summons or process nor had it appeared at any hearing. However, the Pennsylvania court received a copy of an unsworn letter written by Northern Trust to counsel for MLIB and Fanslow dated, October 7, 1994. The letter states:

> "that Northern Trust does not at this time intend to file any briefs or other papers or make any appearance in the above-referenced proceeding ***.
>
> Northern Trust has an office in Pennsylvania, a division called 'Trust Rite System Group,' in Wayne, Pennsylvania. It does not accept deposits or make loans—it is a trust-related data processing operation, and is not in technical terms a 'branch'. Please do not serve any papers at that office."

On that letter and Northern Trust's absence, the Pennsylvania court exercised jurisdiction over Northern Trust, and on October 13, 1994, the Pennsylvania court entered a preliminary injunction against the same entities on substantially the same terms as contained in the October 4 order. In a subsequent memorandum opinion filed October 31, 1994, the Pennsylvania court ruled that Fanslow was amenable to "specific" *in personam* jurisdiction in Pennsylvania in the Summit

case, but the court did not consider or determine whether Fanslow had been served with summons or process. Fanslow appealed the Pennsylvania court's decision and the appeal remained pending until the preliminary injunction was dissolved under circumstances next discussed.

In another proceeding, approximately two years before Summit was placed into rehabilitation, the Pennsylvania authorities filed a similar proceeding against Life Assurance Company of Pennsylvania (LACOP), with which Fanslow was also affiliated. The Pennsylvania Insurance Commissioner sued Fanslow and others regarding their management of LACOP and that suit was still pending when Northern Trust dishonored the NTC L/C during the Summit case.

In July 1994, the parties to the LACOP action entered into a settlement, funded in large measure with the proceeds of the NTC L/C at issue here. Neither Northern Trust nor MLIB was a party to the settlement agreement, and the dispute being settled was totally independent of the allegations purportedly supporting the preliminary injunction in the Summit case.

To consummate the settlement in the LACOP case, Fanslow and the Pennsylvania Insurance Commissioner (the same person in both the LACOP and Summit cases) issued a letter to Northern Trust dated August 3, 1995, in which they jointly authorized and directed Northern Trust to honor the draw documents and pay Fanslow. The letter states in part:

> "Notwithstanding this letter, the payment of the Draw as requested herein will not release, impair or otherwise diminish any claims that Richard Fanslow may have against you by reason of your failure to pay the Draw as and when it was made in October 1994. Richard Fanslow reserves the right to pursue all such claims and does not by the request herein mean or intend that the payment of the Draw will release any such claims except to the extent of the amount of the payment."

Payment of $8 million under the NTC L/C was made on October 10, 1995, but the payment did not include any interest, damages, costs or attorney fees.

In this proceeding, Fanslow sued Northern Trust seeking a declaration that the October 4 and October 13 orders did not afford Northern Trust a valid defense to payment on the draw documents. An amended complaint was filed one month later seeking similar relief.

After the trial court denied Northern Trust's motion to dismiss based on its claim of a prior pending action (the Pennsylvania lawsuit) between the same "parties," both parties filed motions for summary judgment. The motions remained pending until after the settlement in

the LACOP case, whereupon Fanslow filed a four-count second amended verified complaint on November 7, 1995. Count I prayed for damages for wrongful dishonor of the NTC L/C; count II sought damages for wrongful dishonor of the sight draft; count III alleged breach of good faith based on Northern Trust's role in bringing about the October 4 and October 13 orders; and count IV prayed for damages for Northern Trust's unjust enrichment at Fanslow's expense.

On December 29, 1995, the trial court denied Fanslow's motion for summary judgment and granted Northern Trust's motion for summary judgment on counts I and II. The trial court ruled that count I constituted a collateral attack on the Pennsylvania injunctions and that it was "without authority" to disturb those orders. With respect to count II, the trial court ruled that the stamping of the sight draft, together with the representative's initials or signature, was not acceptance, and that the injunction enjoining payment of the NTC L/C also enjoined payment of the sight draft because the sight draft was tendered pursuant to the NTC L/C.

On March 6, 1996, the trial court dismissed count III, holding that an implied covenant of good faith is not actionable as an independent tort. The trial court ruled that interest is not payable on a dishonored letter of credit and struck count IV with leave to replead, which Fanslow did on March 20, 1996. The trial court dismissed count IV on August 7, 1996. Fanslow appeals the summary judgment on counts I and II and the dismissal of count III of his second amended complaint.

We consider (1) whether the Pennsylvania court orders are subject to collateral attack on jurisdictional grounds, (2) whether summary judgment was proper as to plaintiff's wrongful dishonor claims (counts I and II), and (3) whether judgment on the pleadings was proper as to plaintiff's breach of good faith claim (count III).

I

First, Fanslow argues that the Pennsylvania court orders are subject to collateral attack because they had only a " 'frivolous pretense to validity' " (*Celotex Corp. v. Edwards*, 514 U.S. 300, 306, 131 L. Ed. 2d 403, 410, 115 S. Ct. 1493, 1498 (1995), quoting *GTE Sylvania, Inc. v. Consumers Union of the United States, Inc.*, 445 U.S. 375, 386, 63 L. Ed. 2d 467, 477, 100 S. Ct. 1194, 1202 (1980)) because the Pennsylvania court lacked personal jurisdiction over Northern Trust and Fanslow and also lacked jurisdiction over the *res. State Bank v. Thill*, 113 Ill. 2d 294, 497 N.E.2d 1156 (1986); *Levy v. Dickstein*, 70 Ill. App. 3d 180, 187, 388 N.E.2d 97, 102 (1979).

■ A Pennsylvania court may exercise jurisdiction over nonresidents "to the fullest extent allowed under the Constitution of the

United States" pursuant to Pennsylvania's long-arm statute. 42 Pa. Cons. Stat. Ann. § 5322(b) (West 1981). Where the Pennsylvania court's exercise of personal jurisdiction does not offend due process, its orders are to be respected until reversed for error by orderly review either by itself or by a higher court. *Walker v. City of Birmingham*, 388 U.S. 307, 314, 18 L. Ed. 2d 1210, 1216, 87 S. Ct. 1824, 1828 (1967). Accordingly, we consider whether the Pennsylvania court's exercise of personal jurisdiction over Fanslow comports with due process.

■ Due process requires that a court's exercise of jurisdiction over a party comport with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 319, 90 L. Ed. 95, 102, 103-04, 66 S. Ct. 154, 158, 159-60 (1945). The relevant considerations in determining whether sufficient minimum contacts exist to justify the exercise of limited personal jurisdiction over a non-resident are: (1) the individual must have purposefully availed himself of the privilege of conducting activities in Pennsylvania, (2) the cause of action must arise from those activities, and (3) the exercise of jurisdiction must be reasonable. *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 319, 90 L. Ed. 95, 102, 103-04, 66 S. Ct. 154, 158, 159-60 (1945).

■ Here, the Pennsylvania court conducted hearings on its jurisdiction over Fanslow and issued a memorandum opinion applying the *International Shoe* criteria. The Pennsylvania court concluded that "Fanslow's contacts with Pennsylvania residents were not 'random, fortuitous, or attenuated,'" but that Fanslow had "'reach[ed] out beyond one state and created[d] continuing relationships and obligations with citizens of [Pennsylvania].'" The Pennsylvania court further found that Fanslow's "intentional communications" with Summit's subsidiaries "initiated a series of transactions that created and maintained continuing obligations which '[gave] rise to the underlying suit.'" Finally, the Pennsylvania court ruled its jurisdiction over Fanslow was reasonable in light of Fanslow "having previously engaged in the insurance business in this state and having had an attorney here, as well as having until quite recently enjoyed performance on a promised payment of interest."

Even assuming without deciding that the Pennsylvania court orders are subject to collateral attack on jurisdictional grounds, we agree with the Pennsylvania court's jurisdictional analysis.

■ Fanslow contends the Pennsylvania court lacked jurisdiction over Northern Trust. A party may object to personal jurisdiction or improper service of process only on behalf of himself or herself, since the objection may be waived. 42 Pa. Cons. Stat. Ann. Rs. 1028(a), 1032 (West 1989). Accordingly, Fanslow lacks standing to object to the Pennsylvania court's exercise of jurisdiction over Northern Trust.

■ Fanslow further contends the Pennsylvania court lacked jurisdiction because neither he nor Northern Trust was served with summons. Pennsylvania Rule of Civil Procedure No. 1531 provides that written notice to parties in interest is not required where "immediate and irreparable injury will be sustained before notice could be given or hearing held." 42 Pa. Cons. Stat. Ann. R. 1531 (West 1987). Rather, any method of service reasonably calculated to bring the matter to the attention of the adverse party is ordinarily sufficient. *Rothman v. Rothman*, 425 Pa. 406, 228 A.2d 899 (1967). Fanslow admits that he was informed of the hearing scheduled for September 29, 1994. Thus, as to himself, Fanslow's argument is without merit. As to Northern Trust, as previously noted, a party may object to improper service of process only on behalf of himself or herself, since the objection may be waived. 42 Pa. Cons. Stat. Ann. Rs. 1028(a), 1032 (West 1987). Accordingly, Fanslow lacks standing to object to the Pennsylvania court's jurisdiction over Northern Trust.·

■ Next, Fanslow contends the injunction is unenforceable because the Pennsylvania court lacked jurisdiction over the *res*. We disagree. The $8 million on deposit with MLIB securing the MLIB L/C is considered property of the liquidation estate. See *In re Val Decker Packing Co.*, 61 B.R. 831 (S.D. Ohio 1986). The Pennsylvania Insurance Code provides that a Pennsylvania court "may grant[ ] such restraining orders, preliminary and permanent injunctions, and other orders as may be deemed necessary and proper to prevent: *** (ii) the transfer of property; *** (v) dissipation and transfer of bank accounts." 40 Pa. Stat. Ann. § 221.5 (West 1992).

Admittedly, Fanslow's attempt to collect upon the NTC L/C does not directly involve the $8 million on deposit with MLIB in London to which the Pennsylvania Insurance Commissioner lays claim on behalf of Summit's liquidation estate. However, to induce Northern Trust to issue the NTC L/C Stewart arranged to have MLIB guarantee repayment of the funds with the MLIB L/C, which was in turn guaranteed by the $8 million on deposit with MLIB in London. Because the outcome of the dispute over the NTC L/C could impact upon Summit's liquidation estate by depleting its assets, there was a sufficient nexus between the NTC L/C issued to Fanslow and the liquidation of Summit to convey jurisdiction upon the Pennsylvania court to issue an injunction. See *Muir v. Transportation Mutual Insurance Co.*, 107 Pa. · Commw. 638, 642, 529 A.2d 534, 538 (1987).

Finally, while the Pennsylvania court's injunction may have interfered with a business transaction freely negotiated between the parties (see *Stringer Construction Co. v. American Insurance Co.*, 102 Ill. App. 3d 919, 430 N.E.2d 1 (1981)), until the Pennsylvania court's

decision is reversed for error by orderly review, either by itself or by a higher court, the injunction is to be respected (see *Celotex Corp. v. Edwards*, 514 U.S. 300, 313, 131 L. Ed. 2d 403, 407, 115 S. Ct. 1493, 1496 (1995); *Walker v. City of Birmingham*, 388 U.S. 307, 314, 18 L. Ed. 2d 1210, 1216, 87 S. Ct. 1824, 1828 (1967)). Accordingly, Fanslow's collateral attack upon the injunction in the Illinois courts is without merit.

## II

Second, Fanslow argues the trial court improperly granted summary judgment in favor of Northern Trust on count II of his complaint alleging wrongful dishonor of his sight draft. Specifically, Fanslow contends that when the sight draft was received, date-stamped and initialed, it was "accepted," rendering the injunction a nullity and Northern Trust's decision to obey the injunction a wrongful dishonor. Alternatively, Fanslow contends that an issue of fact existed as to whether Northern Trust had "accepted" the sight draft precluding summary judgment. We disagree.

■ Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1996). Here it is undisputed that a representative received, date-stamped and initialed Fanslow's sight draft before Northern Trust was notified of the injunction. The legal effect of the representative's action is a question of law, not a question of fact, and appropriate for summary judgment.

■ The Uniform Commercial Code in effect at the time provided: "A bank to which a documentary draft or demand for payment is presented under a credit may without dishonor of the draft, demand or credit (a) defer honor until the close of the third banking day following *receipt* of the documents." (Emphasis added). Uniform Commercial Code § 5—112 2B U.L.A. 608 (1991).[2] The three-day delay was provided so the bank could examine the documents and determine whether they conformed to the requirements of the applicable letter of credit

---

[2] Article 5 of the Uniform Commercial Code has since been amended. The amended version provides that "[a]n issuer has a reasonable time after presentation, but not beyond the end of the seventh business day of the issuer after the day of its receipt of documents: (1) to honor *** or (3) to give notice to the presenter of discrepancies in the presentation." Uniform Commercial Code § 5—108(b), 2B U.L.A. 139 (Supp. 1998). Moreover, the amended version provides that " 'Dishonor' of a letter of credit means failure timely to honor or to take an *interim action,* such as acceptance of a draft, that may be required by the letter of credit." (Emphasis added.) Uniform Commercial Code § 5—102(a)(5) 2B U.L.A. 130 (Supp. 1998).

and should be accepted. Uniform Customs and Practices for Documentary Credits, 1983 Revision, arts. 14, 16c, I.C.C. Pub. No. 400. This determination was important to the bank because once the draft was *accepted*, the bank would become primarily and unconditionally obligated to pay. *First Commercial Bank v. Gotham Originals, Inc.*, 64 N.Y.2d 287, 475 N.E.2d 1255, 486 N.Y.S.2d 715 (1985). "Acceptance" is the point after which the bank cannot be restrained from paying on such letter of credit and the beneficiary cannot be restrained from demanding or receiving the proceeds. *Tranag, C.A. v. Banca Commerciale Italiana*, 901 Misc. 2d 929, 396 N.Y.S.2d 761 (1977); *Union Export Co. v. N.I.B. Intermarket, A.B.*, 786 S.W.2d 628 (Tenn. 1990).

■ The distinction between "receipt" of documents (triggering the running of the three-day period), and "acceptance" of a draft (triggering the bank's duty to pay), suggests that when, in the ordinary course of business, a bank employee date-stamps and initials documentary drafts (i) to acknowledge their receipt and (ii) to note the time at which the running of the three-day period begins to run, that action is not "acceptance" of those drafts within the meaning of article 5. The Pennsylvania court's injunction, learned of shortly after the representative acknowledged receipt of Fanslow's sight draft, was not too late to enjoin payment. Thus, Northern Trust, which abided by the injunction, cannot be held liable for "wrongful" dishonor of Fanslow's draw documents. *Kelley v. First Westroads Bank*, 840 F.2d 554 (8th Cir. 1988).

### III

■ Third, Fanslow contends the trial court erred in dismissing count III of his complaint. Count III alleges that Northern Trust violated its duty of good faith by informing MLIB's counsel about Trust Rite System Group, a Northern Trust data processing office located in Pennsylvania, and thus facilitated the Pennsylvania court's assertion of jurisdiction. Trust Rite Group was situated in Pennsylvania and subjected Northern Trust to the jurisdiction of the Pennsylvania court whether or not Northern Trust informed the court of the existence of Trust Rite Group. Accordingly, Northern Trust's letter, its submission to the jurisdiction of the Pennsylvania court, and its obedience to the injunction are insufficient to sustain a cause of action of breach of good faith against Fanslow.

We affirm the summary judgment in favor of Northern Trust on counts I and II and affirm the dismissal of count III.

Affirmed.

GALLAGHER and O'MARA FROSSARD, JJ., concur.