187 B.R. 964 (1995)
In re P.A. BERGNER & CO. HOLDING CO., et al., Debtors.
P.A. BERGNER, Plaintiff,
v.
BANK ONE, MILWAUKEE, N.A., Defendant.
Bankruptcy Nos. 91-25501 to 91-25516 and 93-20736. Adv. No. 93-2323.
United States Bankruptcy Court, E.D. Wisconsin.
July 28, 1995.
*965 *966 *967 *968 *969 Amy R. Wolf, Douglas K. Mayer, Wachtell, Lipton, Rosen & Katz, New York City, Marshall Simmons, Michael R. Rochelle, Dallas, TX, Elizabeth Warren (Delivered Oral Argument), University of Pennsylvania Law School, Philadelphia, PA, Charles J. Hansen (Corporate Counsel), P.A. Bergner & Co., Milwaukee, WI, for plaintiff.
G. Christopher Meyer (Delivered Oral Argument), Squire, Sanders & Dempsey, Cleveland, OH, Michael R. Wherry, Michael C. Runde, Davis & Kuelthau, S.C., Russell S. Long (Corporate Counsel), Bank One, Milwaukee, N.A., Milwaukee, WI, for defendant.

AMENDED MEMORANDUM DECISION
M. DEE McGARITY, Bankruptcy Judge.

Introduction
This adversary proceeding for recovery of an avoidable preference or setoff was brought by the debtor in possession, P.A. Bergner & Co. Holding Company ("Bergner" or "debtor") against its prepetition creditor, Bank One, Milwaukee, N.A. ("bank," "creditor" or "Bank One"), on April 26, 1992. For ease of reference, the plaintiff will be referred to as "Bergner" or the "debtor," notwithstanding that the time frame being discussed might be before filing, during the pendency of the Bergner cases, or after confirmation.
The debtor, now known as Carson Pirie Scott & Co., and 14 related entities filed voluntary petitions under chapter 11 on August 23, 1991. Another related entity filed its petition on December 2, 1992. A joint plan of reorganization for all cases, with one exception not pertinent here, was confirmed on October 15, 1993. Shortly after confirmation, final payments under the plan were completed. Bergner's general unsecured creditors received $.33 per dollar of claim, and the class of creditors that purchased the debt owed to a group of lenders headed by Swiss Bank (which appears to have been partially secured and partially unsecured) received equity in the reorganized entity. The plan further provided that the debtor retained the right to prosecute any pending preference actions in its own behalf, and this court has previously held that the provision in the plan was sufficiently explicit to give the postconfirmation entity standing to continue the action (see minutes of hearing on January 20, 1995). At the same January 20, 1995 hearing, the court dismissed two counts in the plaintiff's First Amended Complaint that referred to 11 U.S.C. § 553(a) as inapplicable to the facts of this case. Also, Bergner withdrew its claims respecting any letters of credit issued by defendant, other than those benefitting Bergner's supplier, Associated Merchandising Corporation ("AMC"), and Bergner's insurance carrier, Liberty Mutual Insurance Company ("Liberty").
Both parties have moved for summary judgment on the issue of whether the debtor can recover as an avoidable preference under 11 U.S.C. § 547, or as an avoidable setoff under 11 U.S.C. § 553(b), payments made by Bergner to Bank One for draws on letters of credit issued to AMC and Liberty. For the reasons stated herein, Bergner's motion for summary judgment is granted, and Bergner is entitled to recover both payments as a matter of law.
This court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b); this is a core proceeding under 28 U.S.C. § 157(b)(2)(F). This memorandum decision constitutes the court's findings of fact and conclusions of law in accordance with Fed. R.Bankr.P. 7052.

Facts
The events that transpired between the parties are not in dispute. These facts are derived from briefs, affidavits and exhibits filed with the court, and no facts appear to be controverted.
The plaintiff in this action was, and continues to be after confirmation, the holding company for a number of large department stores, primarily in the Midwest. The defendant is the bank in which Bergner's primary operating account was located. The bank also issued letters of credit in substantial amounts to entities with whom Bergner did business, such as the inventory supplier and insurance company that were the beneficiaries of the letters of credit referenced in this action.
*970 On July 26, 1989, Bank One and Bergner entered into a Standby Letter of Credit Agreement, the master agreement under which the bank would issue standby letters of credit to be paid only if Bergner failed to pay directly amounts owed the beneficiaries or if any other event of default occurred. The pertinent events giving rise to payment pursuant to the two letters of credit at issue in this case were (1) the failure of Bergner to pay amounts due the beneficiaries, (2) the nonrenewal of the letter of credit, and (3) the presentation of conforming documents by the beneficiary. The master agreement required that Bergner pay Bank One amounts drawn on a letter of credit before such amounts were paid by the bank, but payment did not affect the bank's obligation to the beneficiary. See, generally, Matter of Compton Corp., 831 F.2d 586, 589-91 (5th Cir.1987); Toyota Indus. Trucks U.S.A., Inc. v. Citizens Nat'l Bank of Evans City, 611 F.2d 465, 469-71 (3rd Cir.1979); Matter of Val Decker Packing Co., 61 B.R. 831, 837-39 (Bankr. S.D.Ohio 1986).
The master agreement was automatically renewable unless the bank determined not to do so, a so-called "evergreen" type of agreement. If Bank One elected not to renew, it was required to give Bergner and the beneficiaries 60 days notice of its decision. The agreement granted the bank a security interest in funds on deposit with Bank One, but it contained no other collateral for a debt that might arise in connection with a draw.
Standard letters issued to AMC and Liberty provided that if Bergner failed to pay outstanding amounts due the entities, Bank One was obligated to the entities up to the amount of the letter of credit. The amounts outstanding on these letters of credit fluctuated over the years, depending on obligations that Bergner had outstanding to the beneficiaries of the letters of credit or, in the case of AMC, the amount of its outstanding orders for merchandise. Bergner paid a fee as consideration for issuing the letters, which various figures put in the neighborhood of $300,000.

Associated Merchandising Corporation
Associated Merchandising Corporation (AMC), a cooperative buying association acting on behalf of a consortium of department stores, is the purchaser of goods manufactured primarily in Pacific Rim countries. Goods are ordered by the retailers, and AMC contracts with its suppliers for their manufacture. AMC makes its own financial arrangements with manufacturers. It then resells these goods to retailers, such as Bergner, throughout the world. Goods are invoiced to AMC's buyers as soon as they are shipped, and payment is due within 48 hours.
In 1989, AMC required a standby letter of credit to cover the possibility of its not being paid for goods on order to Bergner. Such a letter was provided by Bank One, and there were nine amendments to the original letter as orders fluctuated. When AMC finally drew on the letter, the amount outstanding was $31,207,000. Ninety days before filing, the amount was over $37,000,000. Until the transfer sought to be avoided was made, Bank One had never paid on a standby letter of credit issued to AMC.
On May 23, 1991, Bank One sent a letter to Bergner stating that Bank One would not be renewing its letter of credit. It also notified AMC, and both Bergner and Bank One knew that AMC would now be entitled to draw on the letter of credit, notwithstanding the fact that Bergner owed nothing to AMC at the time. Anticipating a draw on its obligation to AMC, Bank One demanded that Bergner deposit $31,000,000 in its account at Bank One.
On July 19, 1991, AMC presented conforming documents to draw on the letter of credit, nonconforming documents having been presented two days earlier. At the time conforming documents were presented, Bergner had at least $207,000 in its Bank One account. At 11:02 a.m., Bank One received a deposit of $31,000,000 to Bergner's account, which Bergner had acquired by drawing on its revolving line of credit with the Swiss Bank lenders. At 11:15 a.m., Bank One notified Bergner that it had received the funds. At 1:24 p.m., Bank One "memo posted" Bergner's account for the $31,207,000 to be sent to AMC, which means that it effectively froze the account, and prevented Bergner from using the funds for any purpose other than to *971 fund the AMC wire. At 2:11 p.m., Bank One wire transferred $31,207,000 to AMC's account at Hong Kong Shanghai Bank via Bank One's account at the Federal Reserve, thus giving Bergner a credit balance at AMC for goods not yet shipped. At the end of the day, Bank One debited Bergner's account for the amount transferred to AMC. Bank One's internal "Standby Letter of Credit General Ledger Account" was credited for the payment. This account records outstanding standby letters of credit for which the bank might be held liable in the future. Except for the deposit from Swiss Bank, all of the pertinent activity in Bergner's account on July 19, 1991, was initiated by Bank One, not by Bergner.
Thirty-five days later, on August 23, 1991, the Bergner chapter 11 cases relevant to this proceeding were filed. Bergner owed Bank One nothing on its AMC letter of credit obligation. AMC continued to ship goods to Bergner, and most of the credit balance was consumed by postpetition shipments.
Bergner now seeks to recover the prepetition transfer of $31,207,000 to Bank One.

Liberty Mutual Insurance Co.
Liberty was the holder of a letter of credit under the same master agreement as AMC, which covered charges for past insurance coverage. On May 24, 1991, Bank One notified Liberty it would not renew its letter of credit for Bergner when the letter expired on July 31, 1991. Nonrenewal was an event of default under the agreement, and Liberty was at that time entitled to draw approximately $5,800,000. However, on July 29, 1991, two days before the existing letter of credit expired, Bank One agreed to issue a new letter of credit for $6,358,000, thus allowing Bergner to continue insurance coverage and avoiding an immediate draw by Liberty. The new letter of credit provided it could be drawn on only after July 31, 1991, the expiration date of the old letter. Therefore, Bank One's obligation to Liberty and Bergner's letter of credit coverage were uninterrupted.
Two days after the new letter of credit was issued, Bank One learned of the deterioration of Bergner's relationship with Swiss Bank. By letter dated July 31, 1991, Bank One demanded that Bergner keep sufficient funds in its account, at least $6,400,000, to cover the amount outstanding on the Liberty letter of credit. Bergner agreed to maintain the required balance, but in fact, on August 2, 1991, the account was overdrawn. Bergner maintained a balance in excess of $6,400,000 after August 2, 1991, until its bankruptcy filing. Except for the requirement of a minimum balance, the bank did not restrict the account, nor did it ever dishonor checks.
On August 23, 1991, Bergner informed Bank One it intended to file its bankruptcy petition. Bank One immediately debited the account by $6,358,000, and wrote a letter to Bergner stating it had set off the account in the amount of the Liberty letter of credit. The money was deposited in the bank's "Cash Letter of Credit Account," an account kept on Bank One's books for its outstanding letters of credit, and commingled with other bank funds in the account. When the petitions were filed later that morning, no debt was owed Bank One on account of the Liberty letter of credit. The Cash Letter of Credit Account was debited from time to time as Liberty drew on the letter postpetition.
Bergner also seeks to recover the $6,358,000 transferred from the Bergner account to Bank One on August 23, 1991.

Summary Judgment Standard
The policy of the summary judgment procedure is to dispose of factually unsupported claims or defenses, to serve judicial economy, and to avoid unnecessary litigation. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Cloutier v. United States, 19 Cl.Ct. 326 (1990).
Motions for summary judgment in bankruptcy are governed under Fed.R.Bankr.P. 7056, which specifically references Fed. R.Civ.P. 56. A motion for summary judgment:
shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and *972 that the moving party is entitled to a judgment as a matter of law.
Fed.R.Civ.P. 56(c).
In ruling on a motion for summary judgment, the court shall view the facts in a light most favorable to the party opposing the motion. Brock v. American Postal Workers Union, 815 F.2d 466, 469 (7th Cir. 1987). The court's role is not to weigh the evidence on the merits but to determine whether there is a genuine triable issue in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When there are numerous issues in dispute, summary judgment may be used to reduce the number of issues that must be tried and focus the parties on only those issues involving factual disputes.
A party who moves for summary judgment has the initial burden of showing either the absence of a genuine issue of material fact or a complete lack of evidence to support a necessary element of other party's case or defense. Celotex, 477 U.S. at 323, 106 S.Ct. at 2552-53. If this burden is met, the nonmoving party then has the burden of showing the existence of a genuine factual dispute regarding an essential element of its case or defense. Id. at 322-25, 106 S.Ct. at 2552-54. In order to rebut movant's case for summary judgment, the nonmoving party will generally have to go beyond the pleadings and present evidence, by affidavit, deposition or otherwise, to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. at 2553. "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Id.
Both parties have filed cross motions for summary judgment on the merits of the case.
For the first time at oral argument on this motion, counsel for Bank One raised the issue of whether Bergner's motion for summary judgment permitted a final determination on the bank's defenses. Counsel argued that this court could determine whether all of the elements of 11 U.S.C. § 547(b) were met, but the bank's defenses under 11 U.S.C. § 547(c) could not be determined in Bergner's favor because of the wording of Bergner's motion. There was no argument that the bank did not have sufficient notice that Bergner was asking for a decision on the merits disposing of the entire case.
Bergner asked for summary judgment in its favor on counts Three, Four, Seven, Eight and Nine of its First Amended Complaint. These counts seek recovery under 11 U.S.C. § 550 for avoided transfers pursuant to 11 U.S.C. §§ 547 and 553(b). Subsection (b) of § 547 states that the trustee can avoid a transfer of the debtor's interest in property "[e]xcept as provided in subsection (c) of this section[.]" A recovery under 11 U.S.C. § 547(b) necessarily includes a determination of the creditor's defenses under 11 U.S.C. § 547(c), and the provisions of the latter subsection are effectively incorporated by reference in the former. Both are appropriate for summary judgment under these facts.
This court is satisfied that Bergner's motion is adequate to allow this court to find in its favor without the necessity for a trial on the bank's defenses. As Bergner is entitled to recover the full amount of the transfers, whether characterized as preferences or setoffs, the distinction is unnecessary.

Preference Elements  11 U.S.C. § 547(b)[1]

Introduction  Transfer of debtor's interest in property.
The plaintiff has the burden of proof to show by a preponderance of the evidence *973 that each of the five elements of an avoidable preference exist. 11 U.S.C. § 547(g).
The initial requirement for an avoidable preference appears in the introductory section of 11 U.S.C. § 547(b), before the enumeration of the five preference elements. This is the starting point in the analysis of whether a preference has occurred.
Bank One argues that no interest of the debtor in property was transferred by the debit for either letter of credit because a corresponding asset was acquired by the debtor, namely a credit balance with AMC and a credit with Bank One for payment of insurance charges by Liberty. Under this theory, the bank was merely a conduit for the movement of funds. Thus, the debtor's assets were not diminished by the transfers. If the debtor's assets were not diminished by the transfers, the argument continues, there could not have been a transfer of the debtor's interest in property to be avoided.
A number of cases interpret this introductory paragraph of 11 U.S.C. § 547(b) as a requirement that the debtor's estate be diminished by the transfer sought to be avoided. This is akin to a sixth requirement under 11 U.S.C. § 547(b), although this requirement actually comes first.
Bank One argues that this sixth element was not met as there was no transfer because the debtor had credits in place of its cash. Even if there were a transfer, Bank One argues, there was no diminution in the value of Bergner's property; hence, no preference. However, the concept of "diminution of the estate" (technically, diminution of the debtor's property before the estate arises) is a holdover of the preference recovery provision under the Bankruptcy Act. While the requirement does not explicitly appear in 11 U.S.C. § 547(b), the concept has been left undisturbed in the Seventh Circuit without the necessity for analysis. See Matter of Smith, 966 F.2d 1527, 1535-7 (7th Cir.1992), cert. dismissed ___ U.S. ___, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992).
Whether "transfer" and "diminution" are two different concepts, or whether "diminution" is merely descriptive in determining whether a transfer of the debtor's interest in property transpired, this court holds that the debtor's property was transferred with the memo posting and debits Bank One made to cover payment of the AMC and Liberty letters of credit. Furthermore, the debtor's property was diminished by each transfer.
The primary means for determining whether property was transferred is to examine who had control over the property at a particular time and whether that control shifted from one party to another. In an unrestricted bank account, the depositor has control over the funds because it can withdraw the funds at will. Matter of Prescott, 805 F.2d 719, 729 (7th Cir.1986). If control shifts, a transfer has occurred.
While unrestricted funds were property of the debtor, the subsequent restriction of those funds resulted in a transfer to the bank. Bonded Fin. Serv., Inc. v. European Am. Bank, 838 F.2d 890, 893 (7th Cir.1988). A "transfer" is defined in 11 U.S.C. § 101(54) as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property . . ." Bonded Fin. Serv. describes a transfer as occurring when the transferee obtains "dominion" over the property and the right to put the property to its own purposes. Id. Applied to the facts of this case, before the memo posting occurred, Bergner had control of the funds in its account. Earlier, Bergner had control over the $31,000,000 it had borrowed from Swiss Bank; Bergner demonstrated this control by telling Swiss Bank where to send the funds. For over two hours, from the time the money was deposited until Bank One memo posted the account, the funds were unrestricted. The memo posting froze the account and transferred control, and the debiting of the account completed the seizure, thereby changing ownership as well as control. Therefore, a prepetition transfer of *974 Bergner's funds occurred when Bank One memo posted and took control over the $31,207,000.
To refute this proposition, the bank maintains it was only sending Bergner's funds to AMC. Its control demonstrates this was not so. Bergner did not instruct Bank One to send its funds to AMC; no check, debit memo or similar direction from Bergner has been disclosed and offered as evidence. Bank One made the decision when to pay AMC. The funds wired to AMC were the bank's funds. Matter of Compton Corp., 831 F.2d 586, 589 (5th Cir.1987), reh'g granted, 835 F.2d 584 (5th Cir.1988). These funds had already been transferred from Bergner to the bank when the account was seized prior to the AMC wire.
The concept becomes clearer when the bank is correctly viewed not as a receptacle of funds but as a debtor to its depositors and the owner of all of its funds. See, e.g., In re CJL Co., Inc., 71 B.R. 261, 265 (Bankr.D.Or. 1987); In re Zimmerman, 69 B.R. 436, 438 (Bankr.E.D.Wis.1987). The $31,207,000 was transferred by seizure of the funds wired to the debtor, and the bank later transferred its own funds to AMC.
The fact that $31,000,000 of the funds seized by Bank One for the AMC wire were borrowed from Swiss Bank is of no consequence. The transfer of borrowed, unrestricted funds results in the diminution of the debtor's property within the meaning of 11 U.S.C. § 547(b). Smith, 966 F.2d at 1533. In Smith, the bank had allowed the debtor to write checks on a deposit that was subsequently dishonored. This made the bank an inadvertent and involuntary lender. Nevertheless, the court held that payment to a creditor with a check written on these "borrowed" funds resulted in an avoidable preference to the creditor, and the preference had to be returned to the trustee.
If diminution in the debtor's property were a separate requirement for preference recovery, and this court is by no means certain that it is, the transfers from Bergner's account meet this requirement. To determine whether the transfer diminished the debtor's property, it is useful to examine what property the debtor would have had at the time of filing absent the transfer. Here, the debtor would have had the cash in its accounts, including $37,565,000 for the two debits. It would also have had whatever accrued to it by virtue of Bank One honoring the letters of credit, for which Bergner had paid substantial consideration. Bank One intimates that it might not have paid its obligations on the letters, a remarkable posture for a reputable bank to take. Nevertheless, the bank is correct that Bergner is not a third party beneficiary of the letters, and Bergner could not compel compliance on the beneficiaries' behalf. This merely underscores the independence of Bank One's obligation to AMC and Liberty and Bergner's obligation to Bank One. See In re Security Services, Inc., 132 B.R. 411, 414-15 (Bankr.W.D.Mo.1991); Matter of Val Decker Packing Co., 61 B.R. at 837-39. However, even if Bank One had successfully evaded its obligations under the letters of credit, the substantive difference between having unrestricted cash of $37,565,000 and having credits of $37,565,000 that can be used only for one supplier, AMC, and for one insurance carrier, Liberty, is significant enough to constitute diminution of the debtor's property.
The "earmarking doctrine," developed to interpret whether an interest of the debtor in property has been transferred, clearly does not apply to these facts. Earmarking occurs only when a new creditor advances funds, and the parties intend that those funds be used to pay an antecedent creditor. Payment of the old creditor is a condition for obtaining the new credit. See, e.g., Matter of Smith, 966 F.2d at 1533; In re Love, 155 B.R. 225, 230 (Bankr.D.Mont.1993). This type of transfer results only in the substitution of creditors, and there is no diminution in the debtor's property. Swiss Bank loaned the funds with no agreement as to their use to pay AMC; in fact, Swiss Bank's representative testified at his deposition that Swiss Bank had no right under the loan agreement to direct how Bergner used its borrowed funds. Therefore, the earmarking doctrine does not apply.
Similarly, Bank One's debit to the debtor's account to pay its liability on the Liberty *975 letter of credit constituted a transfer of the debtor's funds to a special account in the bank's control, the "Cash Letter of Credit Account." These were commingled with other Bank One funds in the account. The debtor could neither control nor direct how those funds were to be used because they were no longer the debtor's funds. This satisfies the initial requirement that there be a transfer of the debtor's interest in property.
The following is a discussion of the five elements of 11 U.S.C. § 547(b), as they relate to the $31,207,000 debit of Bergner's account for the AMC letter of credit and the $6,358,000 debit for the Liberty letter of credit. The court is satisfied that Bergner has met its burden of proof as to all of these elements as a matter of law.

AMC
1. To or for the benefit of a creditor.
The bank argues that the $31,207,000 transferred was from Bergner to AMC, which was neither a creditor at the time of the transfer nor a defendant in an adversary proceeding, not from Bergner to the bank. It maintains the bank merely served as a conduit or vehicle for the transfer of Bergner's funds. Alternatively, the bank argues that when it did receive the funds, the bank was not Bergner's creditor because it had not yet paid AMC. Following this reasoning, if Bank One were not a creditor, it could not have received a preference.
Neither of Bank One's characterizations of the AMC account debit is persuasive. As was discussed in the introductory section, the memo posting of Bergner's account was a transfer to Bank One. Bank One then posted the funds to its own Federal Reserve account, which it argues is a prerequisite for a wire transfer on behalf of a depositor. This may indeed be so. However, the mechanics of wire transfers notwithstanding, the bank had control over where the money went. It went to AMC at Bank One's direction, not Bergner's. Thus, the bank transferred its own funds. See also Matter of Val Decker Packing Co., 61 B.R. at 839. Furthermore, the transfer was for Bank One's benefit in that it eliminated the bank's liability to AMC on account of its letter of credit. When the debtor pays an obligation of another party, it has made a transfer for the benefit of that party, which can be avoided as a preference. See, e.g., Levit v. Ingersoll Rand Fin. Corp., 874 F.2d 1186, 1192 (7th Cir.1989) (transfer to creditor by principal was preference to guarantor).
The bank claims it was not a creditor of Bergner at the time of the debit. It cites various commentators and cases that describe a liability to the issuing bank as arising when the letter of credit is paid, not before. However, the Standby Letter of Credit Agreement in this case states otherwise. The bank was at least a contingent creditor before it paid AMC, which satisfies the definition of "creditor" under the Bankruptcy Code. 11 U.S.C. § 101(10); see also 11 U.S.C. §§ 101(5), (12); Matter of Milwaukee Cheese, 164 B.R. 297, 305 (Bankr. E.D.Wis.1993). More accurately, because AMC had presented conforming documents for the draw earlier the same day, and because Bergner was contractually obligated to pay Bank One (not AMC) before payment of the draw, the obligation had matured and was no longer contingent. Payment to AMC, with its attendant liability of Bergner to Bank One, was a certainty after presentation of conforming documents. Bank One demanded the deposit, as it had a right to do under the contract. The bank's distinction that payment was due, even though the liability had not yet been incurred, is unavailing. That distinction has already been rejected elsewhere. In re Western World Funding, Inc., 54 B.R. 470, 476-77 (Bankr. D.Nev.1985). If an entity is entitled to payment, how can that entity not be a creditor under the Bankruptcy Code's expansive definition? Obviously, an entity entitled to payment is a creditor. 11 U.S.C. § 101(10).
Finally, the only reason Bergner would create a huge credit with AMC is to satisfy its obligation to Bank One. After all, Bergner owed AMC nothing. Therefore, the court finds that Bank One was a creditor of Bergner, and the seizure of Bergner's funds from its account by memo posting, followed by debit and transfer to Bank One accounts, *976 satisfies the requirement under 11 U.S.C. § 547(b)(1) of a transfer to a creditor or for the benefit of a creditor.
2. For or on account of an antecedent debt owed by the debtor, before such transfer was made.
Bank One characterizes this transaction as a transfer from Bergner to AMC. Bergner was not obligated to prepay AMC, and the bank is correct that prepayments, at least those not required by contract, are not antecedent debts. But Bergner is not asking to recover the funds paid to AMC; it seeks to recover the funds seized from its account by Bank One. Bank One is the creditor referred to in 11 U.S.C. § 547(b)(2), not AMC. Here, Bank One had an independent obligation to AMC under the standby letter of credit, which is separate from Bergner's obligation to Bank One. See Matter of Compton Corp., 831 F.2d at 590; In re Carley Capital Group, 119 B.R. 646, 647-48 (W.D.Wis.1990); In re Security Services, Inc., 132 B.R. 411, 414 (Bankr.W.D.Mo.1991). See also Toyota Indus. Trucks U.S.A., Inc. v. Citizens Nat'l. Bank of Evans City, 611 F.2d at 469-70. The bank was obliged to perform whether Bergner prepaid the bank or not.
Bank One argues it was only a contingent creditor of Bergner, and a contingent creditor cannot hold an antecedent debt within the meaning of 11 U.S.C. § 547(b)(2). On the contrary, contingent debts are also antecedent debts within the meaning of 11 U.S.C. § 547(b)(2). See, e.g., Matter of Milwaukee Cheese, 164 B.R. at 305; Matter of Val Decker Packing Co., 61 B.R. at 841. Cases cited by the bank, such as Matter of Wey, 854 F.2d 196 (7th Cir.1988), are distinguishable. In Wey, the transfer sought to be avoided was the forfeiture of a down payment that occurred when the debtor could not complete a sale. The court stated that a debt does not arise until there is a legal obligation to pay, and the debtor was not obligated to pay until closing. There was no debt until his breach, which extinguished his interest in the down payment previously transferred. The breach resulted in no transfer as well as no antecedent debt. This is distinguishable from cases such as Milwaukee Cheese, in which the liability for payment was certain, but the timing of payment or the happening of an additional event was uncertain.
In this case, events had developed to a point of certainty that made Bank One no longer a contingent creditor. The letter was not to be renewed, which was an event of default. Moreover, AMC had drawn on its letter. This meant that when Bergner's account was seized, Bergner's debt to Bank One had matured and was payable. The agreement between Bergner and Bank One required payment before the draw, not reimbursement after the draw; thus, the money was already owed to Bank One when the debit of Bergner's account occurred. The obligation sought to be avoided was not a prepayment to AMC; it was payment on a mature obligation of Bergner to Bank One. This satisfies the requirement that the transfer was on account of an antecedent debt owed by the debtor before the transfer was made. 11 U.S.C. § 547(b)(2).
3. Made while the debtor was insolvent.
This is not disputed by the parties. The debtor was insolvent at all times during the 90 days before filing.
4. Made within 90 days before the date of filing the petition.
It is undisputed that the transfer in question was made 35 days before filing of the petitions under chapter 11.
5. That enables the creditor to receive more than it would in a chapter 7 case if the transfer had not been made.
Bergner asserts, without refutation by Bank One, that unsecured creditors would have received nothing if the transfer had not been made and if Bergner and its companion cases had been filed under chapter 7. Bank One was paid in full. Therefore, if the transfer of $31,207,000 to Bank One is avoidable, it is avoidable in full.
Nevertheless, Bank One argues that it had a security interest in Bergner's account, and it would have been paid 100 cents on the dollar in a chapter 7 case, not 0 cents on the dollar as an unsecured creditor. *977 To the extent a creditor is paid on an unavoidable secured claim during the preference period, the payment is not subject to recovery as a preference. See, e.g., Levit v. Ingersoll Rand, 874 F.2d at 1199-1200; Barash v. Public Fin. Corp., et al., 658 F.2d 504, 508 (7th Cir.1981). Thus, a transfer within the preference period can pay the secured creditor 100% of the claim and not run afoul of 11 U.S.C. § 547(b)(5). The fact that unsecured creditors actually received $.33 on the dollar of claim is irrelevant to this test.
The master Standby Letter of Credit Agreement granted Bank One a security interest in accounts at Bank One. However, an unperfected security interest is subject to avoidance. See, e.g., 11 U.S.C. § 544(a). Furthermore, a previously unperfected security interest that is perfected during the preference period is also subject to avoidance. 11 U.S.C. § 547(b). As deposit accounts are not governed by the Uniform Commercial Code, Wis.Stat. § 409.104(13), perfection must be accomplished under the common law, i.e., by seizure. In re CJL, 71 B.R. 261, 264-65 (Bankr.D.Or.1987); Matter of Zimmerman, 69 B.R. at 438 n. 1.
Bank One had never restricted or seized funds from Bergner's account before it seized the $31,207,000. Therefore, any security interest in Bergner's account arising under the Standby Letter of Credit Agreement was unperfected until seizure. The perfection by seizure was a transfer subject to avoidance, occurring as it did within the 90 day preference period. 11 U.S.C. § 547(b). Consequently, this court holds that the transfer is avoidable in full. 11 U.S.C. § 547(b)(5).

Liberty
As with the AMC letter of credit and the funds seized to pay the draw, the five elements of 11 U.S.C. § 547(b) must be analyzed with respect to the Liberty letter of credit and the funds seized for payment to Bank One.
1. To or for the benefit of a creditor.
As was the case with the AMC letter of credit, the account debit of $6,358,000 on the day of filing was a transfer to Bank One. The funds were posted to the bank's internal "Cash Letter of Credit Account," which was itself debited as Liberty drew on its letter of credit from time to time postpetition.
When these funds were seized on August 23, 1991, Liberty had not presented documents to draw on the letter of credit issued on July 29, 1991. Nevertheless, Bank One was a creditor of Bergner's because it had at least a contingent claim on the date of filing arising under the letter of credit. This is sufficient to make Bank One a creditor within the meaning of 11 U.S.C. § 547(b)(1). See also 11 U.S.C. §§ 101(5)(a), (10). Moreover, the insolvency of Bergner, followed by the bankruptcy filing, was an event of default under the Liberty letter of credit. That insolvency matured Bank One's obligation to Liberty under the letter of credit, thereby maturing Bergner's obligation to pay Bank One before the draw. Even if a contingent creditor were not a "creditor" under 11 U.S.C. § 547(b)(1), a creditor having a mature debt such as Bank One's does qualify.
The account debit was also a transfer "for the benefit of" Bank One since it gave the bank a fund from which to satisfy its own obligation to Liberty. This alone is sufficient to meet the requirement of 11 U.S.C. § 547(b)(1).
2. For or on account of an antecedent debt owed by the debtor before such transfer was made.
At the time Bank One debited Bergner's account for $6,358,000, Liberty had not presented documents to draw on its letter of credit. Bank One had not paid Liberty, and the debtor did not owe Liberty anything. From these facts, the bank infers that there was no "antecedent debt" when it seized the funds on the day of filing.
As was stated above, a contingent debt does satisfy the requirement of an antecedent debt under 11 U.S.C. § 547(b)(2). However, Liberty had a right to draw on the letter because of Bergner's insolvency and bankruptcy, and such a draw was a virtual certainty. Under the letter of credit agreement, payment by Bergner was required before Liberty drew, not after, which made the *978 debt no longer contingent. Therefore, this court holds that Bergner's obligation to Bank One for the Liberty letter of credit was an antecedent debt under 11 U.S.C. § 547(b)(2).
3. Made while the debtor was insolvent.
This is not disputed by the parties. The debtor was insolvent at all times during the 90 days before filing.
4. Made within 90 days before the date of filing the petition.
It is undisputed that the transfer in question was made before the petition was filed and on the same date.
5. That enables the creditor to receive more than it would in a chapter 7 case if the transfer had not been made.
As was stated earlier, unsecured creditors would have received nothing if the Liberty seizure had not occurred and the debtors had filed petitions under chapter 7. The bank argues again it was fully secured, because this time it took a security interest in the debtor's account when it issued the new letter of credit on July 29, 1991, and the actual perfection by demand or by seizure was substantially contemporaneous. 11 U.S.C. § 547(c)(1). However, the letter from Bank One to Bergner outlining their agreement for issuance of the new letter stated that "on or before January 31, 1992, the entire $12,000,000 credit facility will be collateralized . . ." (emphasis added). It did not say the letter of credit is now collateralized. The letter of credit would be collateralized in the future, but it was not collateralized when the letter was issued. Consequently, the subsequent perfection when the account was seized on August 23, 1991, is subject to avoidance for the same reasons that the perfection of the bank's security interest in the account for recovery of amounts due AMC was avoidable. These facts are in stark contrast with the facts of Pine Top Ins. Co. v. Bank of Am. Nat'l. Trust and Sav. Ass'n., et al., 969 F.2d 321 (7th Cir.1992), in which the loan agreement called for granting of a security interest when the obligation was incurred.
If the bank had not seized the debtor's funds on the date of filing, paying itself 100 cents on the dollar, and if the debtor had filed chapter 7 cases, the bank as an unsecured creditor would have received nothing. Therefore, as with the seizure of funds for the AMC letter of credit, the transfer for the Bank's Liberty obligation meets the criterion for avoidability under 11 U.S.C. § 547(b)(5).

Creditor's Defenses  11 U.S.C. § 547(c)[2]
Once the plaintiff has established that all of the elements of 11 U.S.C. § 547(b) *979 exist, the creditor has the burden of proof to show by a preponderance of the evidence that the transfer is not avoidable because a defense under 11 U.S.C. § 547(c) applies. 11 U.S.C. § 547(g). Successful proof of any of these defenses results in an unavoidable transfer.

AMC
1. Intended by debtor and creditor to be a contemporaneous exchange for new value and was a substantially contemporaneous exchange.
Congress carved out an exception to avoidable preferences to protect transactions intended to be a contemporaneous exchange for new value, provided the transfer is in fact a contemporaneous exchange for new value. 11 U.S.C. § 547(c)(1). "New value" is defined in 11 U.S.C. § 547(a)(2) as "money or money's worth in goods, services, or new credit, or release" of property previously transferred, provided the previous transfer is not itself avoidable. The definition specifically does not include an obligation substituted for an existing obligation, i.e., a rollover. 11 U.S.C. § 547(a)(2). A transaction qualifying for this exception stands alone; that is, the transaction under scrutiny is independent of an antecedent debt that the debtor owes the creditor.
No transaction constituting a contemporaneous exchange for new value occurred when Bank One seized the Bergner bank account. The only purpose for Bergner's deposit, which both parties knew would be swept up by the bank, was to pay Bergner's obligation on the letter of credit; there is no evidence Bergner intended by the deposit to purchase a credit balance at AMC. Nothing in the affidavits presented by the bank supports any other purpose for the payment/deposit but to pay Bergner's obligation to Bank One.
More importantly, upon seizure of the funds when the transfer occurred, Bank One did not incur a contemporaneous corresponding obligation to Bergner, which would be necessary for a successful defense under 11 U.S.C. § 547(c)(1). The bank's only obligation was to AMC, which it paid. The bank neither intended to transfer anything to Bergner, nor did it in fact transfer anything to Bergner at the time of the seizure. Therefore, there was no contemporaneous exchange for new value.
2. Debt was incurred in ordinary course of business affairs of debtor and creditor, and payment is made in ordinary course of business affairs of debtor and creditor and according to ordinary business terms.
There are three necessary elements for the "ordinary course" defense under 11 U.S.C. § 547(c)(2), all of which must be met for a creditor to resist disgorgement of an otherwise avoidable preference. The first, that the debt be incurred in the ordinary course of the business affairs of the *980 debtor and creditor, is met here. 11 U.S.C. § 547(c)(2)(A). It is undisputed that the parties established a substantial letter of credit relationship over the two years preceding the bankruptcy.
The second requirement is that the debt be paid in the ordinary course of the business affairs of the debtor and creditor. This defense was intended to leave normal business relations undisturbed and to avoid transfers brought about only by unusual actions taken by the debtor or creditor that resulted in a creditor obtaining a relatively better position than other similarly situated creditors. See In re Energy Co-op., Inc., 832 F.2d 997, 1004 (7th Cir.1987), citing legislative history. In Matter of Tolona Pizza Products Corp., 3 F.3d 1029, 1032 (7th Cir. 1993), the court required that for a creditor to be protected from having to disgorge a prepetition transfer, the transfer or payment should "conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period." While transactions need not occur often to be found in the ordinary course, the same court said "a creditor asserting § 547(c)(2) must show that the debtor incurred its debt and paid the creditor in ways similar to other transactions." In re Energy Coop., Inc., 832 F.2d at 1004 (citations omitted).
This court's colleague in Matter of Milwaukee Cheese Wisconsin, Inc., 164 B.R. 297, 307 (Bankr.E.D.Wis.1993) (citations omitted), identified four tests to examine the circumstances surrounding the challenged payment. Each test might be probative of the parties' prior relationship in determining what was ordinary for the parties. These are particularly illuminating when applied to the undisputed facts in this case:
"(1) whether the transfer was in an amount more than usually paid." Neither party suggested there was a prior payment by Bergner that even approached $31,207,000, and this court will boldly characterize this as an unusually substantial amount.
"(2) whether the payments were tendered in a manner different from previous payments." There is no allegation that Bank One had ever involuntarily seized Bergner's bank account for payment of an obligation.
"(3) whether there appears to be any unusual action by either the debtor or creditor to collect or pay the debt." This factor is most telling. Bergner borrowed $31,000,000 from Swiss Bank to make the deposit, and Bank One seized the funds. Before doing so, Bank One had cancelled the letter of credit, thereby precipitating the event of default. This was not standard conduct of the parties.
"(4) whether the creditor did anything to gain an advantage in light of the debtor's deteriorating financial condition." Involuntary seizure of a bank account gave the bank a significant advantage over other creditors.
The third element of the 11 U.S.C. § 547(c)(2) defense is that the payment be made according to ordinary business terms. This requires inquiry into "the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." Matter of Tolona Pizza Prod. Corp., 3 F.3d at 1033. The bank's officer, Thomas Gaglione, stated in his affidavit that it was within the ordinary course of the business of banks issuing standby letters of credit to refuse to renew those letters on expiration, to demand prepayment of drafts, and to ask customers how they wish to pay for drafts. Such practices may be common in the banking industry. However, he also stated in his deposition, "No one expects a standby letter of credit to be drawn."
Conspicuously absent from Mr. Gaglione's affidavit is any assertion that Bergner gave instructions for debiting the account. The involuntary seizure of funds in an account may be something banks commonly do to protect their legal rights. However, there was no assertion by Bank One or its experts that such a seizure is a common industry practice during the ongoing letter of credit relationship or at its ordinary termination.
This is simply not the sort of transaction intended to be protected by 11 U.S.C. *981 § 547(c)(2); it is precisely the type of "idiosyncratic" exercise of creditor muscle that 11 U.S.C. § 547 was designed to avoid. Matter of Tolona Pizza Products, 3 F.3d at 1033.
Although a deposit to a bank account can be a transfer to the bank, unrestricted bank accounts usually are considered funds of the depositor. Matter of Prescott, 805 F.2d at 729. Banks cannot deal with those funds without the permission of the depositor except in unusual circumstances, usually related to the debtor's precarious financial circumstances. Nothing in Bank One's submissions of proof has alleged that banks ordinarily take control over depositors' accounts, even when the depositor has a loan outstanding, as was done here.
Therefore, the seizure of Bergner's account and payment to itself for the AMC wire was outside the ordinary course of business or financial affairs of the debtor and the transferee, and the resulting transfer was not made according to ordinary business terms. 11 U.S.C. § 547(c)(2)(B), (C).
3. To the extent that after such transfer, creditor gave new, unpaid, unsecured value to debtor.
This subsection, 11 U.S.C. § 547(c)(4), was raised by the bank but is inapplicable to the facts. This defense requires that after the transfer, the creditor gave new value to the debtor, and the new value was not paid for ("on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor"). 11 U.S.C. § 547(c)(4)(B); Matter of Century Brass Prod., Inc., 71 B.R. 77, 78-79 (Bankr.D.Conn. 1987). Bank One was paid in full before filing, so there was no new value given by Bank One after the transfer for which it was unpaid.
Other subsections of 11 U.S.C. § 547(c) are likewise inapplicable to the facts.

Liberty
1. Intended by debtor and creditor to be a contemporaneous exchange for new value and was a substantially contemporaneous exchange.
Bank One argues that the transfer the court should focus on with respect to the Liberty payment is issuance of the new letter of credit on July 29, 1991. The bank maintains that the issuance of this new letter served as consideration for the granting of a security interest in the account, and that the perfection of the security interest by restricting the account, i.e., requiring a minimum balance of $6,400,000, constituted contemporaneous perfection. If the granting of the security interest was a contemporaneous exchange for new value protected by 11 U.S.C. § 547(c)(1), then the subsequent seizure would likewise be protected. 11 U.S.C. § 547(b)(5).
The bank cites Pine Top Ins. Co. v. Bank of Am. Nat'l. Trust and Sav. Ass'n., et al., 969 F.2d 321 (7th Cir.1992), in support of this theory. A careful reading of Pine Top, however, reveals that the parties in that case intended the granting of a security interest when the loan was made. The parties in this case did not. As was stated earlier, the agreement states that the letter of credit obligation would be collateralized in the future, not at the time of issuance.
The requirement of a minimum balance, merely a demand and not actual control, came when the bank learned of Bergner's problems with Swiss Bank two days after the letter of credit was issued. Perhaps the bank would not have issued the letter had it known about the precarious nature of the revolving line of credit, but the fact remains that the bank did not know, and it did not take or perfect a contemporaneous security interest on July 29, 1991. Even if the demand for a minimum balance were sufficient for perfection, which this court is satisfied it is not, the granting of the security interest in the account and perfection were not contemporaneous with issuance of the letter. See In re CJL, 71 B.R. at 264-66.
Bank One has argued that the new letter of credit issued July 29, 1991, was not a renewal of the old expired letter of credit and that it constituted "new value." This court is satisfied that, except for the $500,000 increase in the amount payable to Liberty, the issuance of the new letter merely took the place of the old letter. Issuance of the new *982 letter continued the obligation of Bank One to Liberty uninterrupted, and it prevented a draw under the old letter, a significant benefit to Bank One. The new letter was "substituted for an existing obligation" of Bank One to Liberty as that term is used in 11 U.S.C. § 547(a)(2), and it is not new value. In any event, whether the issuance of the new letter is new value relates to Bank One's obligation to Liberty, not Bergner's obligation to Bank One. Only the latter is the subject for recovery in this action, and whether the seizure satisfied Bergner's obligation to Bank One for a new or reissued letter of credit is irrelevant.
The decisive question is, if there was an exchange for new value, what was the new contemporaneous consideration that Bank One gave Bergner in exchange for the money seized? There was none, as Bank One had already obligated itself to pay Liberty when each letter of credit was issued. Matter of Compton Corp., 831 F.2d at 590; In re Security Services, Inc., 132 B.R. at 414. Thus, the analysis of the debit of Bergner's account on August 23, 1991, for the Liberty letter of credit is similar to the analysis for AMC. The debit was intended to reduce Bergner's obligation to Bank One, not to create a credit on Bank One's books for application to future insurance charges, because on August 23, 1991, Bergner had no obligation to pay Liberty for either a debt or as a prepayment for future services.
Therefore, neither the issuance of the July 29, 1991 letter of credit nor the subsequent seizure of Bergner's account to pay Bank One for future draws on the Liberty letter of credit were contemporaneous exchanges for new value within the meaning of 11 U.S.C. § 547(c)(1).
2. Debt was incurred in ordinary course of business affairs of debtor and creditor, and payment is made in ordinary course of business affairs of debtor and creditor and according to ordinary business terms.
As with the AMC letter of credit, the debt of Bergner to Bank One for the Liberty letter of credit was incurred in the ordinary course of the business of the debtor and the creditor. Also for the same reasons stated above, the debt was not paid in the ordinary course, nor was it paid according to ordinary business terms. Involuntary seizure of the account was, as between Bergner and Bank One, highly unusual (although it had been done at least once previously with the AMC letter of credit). It was clearly done in response to Bergner's insolvency. The seizure was a form of self help that put Bank One in a superior position to other unsecured creditors. Therefore, the transfer was outside the ordinary course of business affairs of the debtor and creditor.
Similarly, ordinary business terms with respect to a bank account requires direction by the depositor, not involuntary seizure. Matter of Prescott, 805 F.2d at 729. For the same reasons applicable to the payment for the AMC letter of credit, the seizure for the Liberty letter of credit was outside ordinary business terms. 11 U.S.C. § 547(c)(2)(C).
3. To the extent that after such transfer, creditor gave new, unpaid, unsecured value to debtor.
As with the AMC letter of credit, 11 U.S.C. § 547(c)(4) is inapplicable to the seizure of Bergner's account for the Liberty letter of credit. The obligation was not unpaid at the time of filing, as is required for application of this defense.
Other subsections of 11 U.S.C. § 547(c) are likewise inapplicable to the facts.

Setoff  11 U.S.C. § 553(b)[3]
Whether the two transfers in question are analyzed as preferences under 11 U.S.C. § 547 or prepetition setoffs of mutual obligations under 11 U.S.C. § 553, the result here is the same. Damages are calculated *983 differently under the two statutes, but both are limited to the amount of the transfers. Damages under the setoff statute are the amount by which the creditor improved its relative position with respect to the debtor's and creditor's mutual obligations during the 90 day period before filing, but no more than the amount of the transfers. 11 U.S.C. § 553(b)(1). A comparison of the amount due the bank on the outstanding letters of credit with the bank account balance 90 days before filing (the "insufficiency" comparison under 11 U.S.C. § 553(b)) results in a number that exceeds the amount of the two transfers.[4] Thus, damages are the amount of the transfers if either the preference or setoff statute is applied. The setoff statute does not provide for defenses found in 11 U.S.C. § 547(c), but the two statutes are analogous. See Matter of Prescott, 805 F.2d at 730. Both are intended to avoid transactions that place a creditor in a better position than it would have been at the time of the debtor's bankruptcy absent the transfer or setoff.
The seizures of Bergner's account and the cancellation of Bergner's indebtedness on Bank One's books, which the parties agree took place in each instance shortly after the account was debited, are appropriately designated setoffs, i.e., the offset of mutual debts. The bank owed Bergner the amount in the account as its depositor, and Bergner owed Bank One for draws that had taken place on the AMC letter of credit and for Liberty's inevitable draw. Each seizure and corresponding book entries constituted a setoff of those mutual debts, and Bank One's letter to Bergner of August 23, 1991, so states. The July 19, 1991 events resulting in the AMC payment were essentially the same.
Taken in isolation, the seizure of the accounts, by debit or memo posting, might be considered "transfers" as they resulted in the perfection of the bank's security interest. The security interest had arisen in the Standby Letter of Credit Agreement of July 26, 1989, but the interest was unperfected until seizure occurred. The perfection of a security interest results in a transfer that would require analysis under 11 U.S.C. § 547(b) and consideration of the bank's defenses under 11 U.S.C. § 547(c), as was shown above.
Under the instant facts, the characterization of events as a transfer or a setoff results in a distinction without a difference. Bergner is entitled to recover the amount seized under either statute.

Double Recovery  11 U.S.C. § 550(d)
Bank One argues that recovery by Bergner of a preference or avoidable setoff permits the debtor to recover twice: first, Bergner received the benefits of the AMC credit and the goods the credit bought, and Bergner received insurance coverage as Liberty drew down its letter of credit; second, if Bergner prevails in this action, it would also receive the funds that previously purchased those assets.
Section 550(d) allows only a single recovery under subsection (a), which designates transferees from whom recovery may be sought. Bank One is the initial transferee of the funds taken from Bergner, and AMC and Liberty are transferees of the initial transferee. 11 U.S.C. § 550(a). Subsection (b) of § 550 provides that a subsequent transferee who acquires a transfer for value, including satisfaction of an antecedent debt, is not subject to recovery. As Bank One had independent antecedent debts to AMC and Liberty by virtue of its letters of credit, which were satisfied by the bank's payments, *984 Bergner cannot recover from those entities. 11 U.S.C. § 550(b)(1).
Bergner cannot pursue AMC and Liberty as creditors who received indirect transfers or for whose benefit transfers were made. 11 U.S.C. § 547(b)(1). AMC and Liberty were not Bergner's creditors when payment was made. They were only Bank One's creditors.
Had Bank One not seized the account on those two occasions, Bergner would have had precisely what it now seeks, the funds in its account. Bank One's independent obligations would have eventually inured to Bergner's benefit because of Bank One's payments, but as the bank points out, Bergner had no enforceable right to those benefits by virtue of having its bank account seized. Any benefit to Bergner arose as a result of Bank One satisfying its own liabilities, not on account of the transfer from Bergner.
In sum, Bergner has only one preference defendant, actual or potential, and only one recovery. In re Skywalker, Inc., 155 B.R. 526, 530 (9th Cir. BAP1992). This satisfies the requirement of a single recovery as provided by 11 U.S.C. § 550(d).

Prejudgment Interest
Bergner has asked the court to award prejudgment interest on its avoided transfers. No provision in the Bankruptcy Code provides for prejudgment interest, and such an award is not "mandatory or automatic." In re Energy Co-op., Inc., 130 B.R. 781, 792 (N.D.Ill.1991), aff'd 832 F.2d 997 (7th Cir.1987).
If such interest were awarded, it would only be from the time Bergner made demand for return of the preferences, and the commencement of this action would be an appropriate starting point. The court believes no interest should be paid from the time of transfer to the commencement of the action because, up until that point, the payment was legal and unavoidable in all respects. A preference is not an avoidable preference until the court determines that it is.
Interest is to compensate the debtor for its inability to use the funds while in the transferee's control, but it is unlikely that Bergner would have had use of the money subsequent to the transfer. Bergner's unsecured creditors received $.33 on the dollar under the joint plan. Had the debtor had sufficient cash, chances are that number would have been higher. As debtor would have had to fund the plan, it is doubtful that Bergner would have retained the funds. Consequently, at this point, prejudgment interest would be a windfall to Bergner.
Accordingly, prejudgment interest will be denied.

Conclusion
For the reasons stated herein, there is no dispute as to any material fact, and the plaintiff is entitled to judgment as a matter of law. Fed.R.Bankr.P. 7056. The plaintiff's motion for summary judgment is granted in its entirety, and the defendant's motion for summary judgment is denied. Plaintiff shall have judgment against the defendant for $37,565,000, plus costs. Prejudgment interest is denied.
Counsel for Bergner will prepare the order for judgment consistent with this decision.
NOTES
[1] 

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property 
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made 
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if 
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. § 547(b).
[2] 

(c) The trustee may not avoid under this section a transfer 
(1) to the extent that such transfer was 
(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
(B) in fact a substantially contemporaneous exchange;
(2) to the extent that such transfer was 
(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(C) made according to ordinary business terms;
(3) that creates a security interest in property acquired by the debtor 
(A) to the extent such security interest secures new value that was 
(i) given at or after the signing of a security agreement that contains a description of such property as collateral;
(ii) given by or on behalf of the secured party under such agreement;
(iii) given to enable the debtor to acquire such property; and
(iv) in fact used by the debtor to acquire such property; and
(B) that is perfected on or before 20 days after the debtor receives possession of such property;
(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor 
(A) not secured by an otherwise unavoidable security interest; and
(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;
(5) that creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interests for such debt on the later of 
(A)(i) with respect to a transfer to which subsection (b)(4)(A) of this section applies, 90 days before the date of the filing of the petition; or
(ii) with respect to a transfer to which subsection (b)(4)(B) of this section applies, one year before the date of the filing of the petition; or
(B) the date on which new value was first given under the security agreement creating such security interest;
(6) that is the fixing of a statutory lien that is not avoidable under section 545 of this title;
(7) to the extent such transfer was a bona fide payment of a debt to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with state or territorial law by a governmental unit, or property settlement agreement, but not to the extent that such debt 
(A) is assigned to another entity, voluntarily, by operation of law, or otherwise; or
(B) includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance or support; or
(8) if, in a case filed by an individual debtor whose debts are primarily consumer debts, the aggregate value of all property that constitutes or is affected by such transfer is less than $600.
11 U.S.C. § 547(c).
[3] 

(b)(1) Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(14), 365(h), 546(h), or 365(i)(2) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of 
(A) 90 days before the date of the filing of the petition; and
(B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.
(2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.
11 U.S.C. § 553(b).
[4] See Bergner brief filed February 22, 1994, p. 27, n. 7.